[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 09-16371, 10-11531, 10-12968
_____

D. C. Docket No. 07-01524-CV-T-30TBM

DIANE T. GOWSKI, M.D.,
SALLY B. ZACHARIAH, M.D.,

Plaintiffs-Appellees-
Cross-Appellants,

versus

JAMES PEAKE, M.D., Secretary,
Department of Veterans Affairs, et al.,

Defendants,

ERIC K. SHINSEKI,

Defendant-Appellant-
Cross-Appellee.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____
(June 4, 2012)

Before EDMONDSON, KRAVITCH and FARRIS,[*] Circuit Judges.

PER CURIAM:

This appeal and cross-appeal arise from a jury verdict and award of damages and injunctive relief in favor of Doctors Diane Gowski and Sally Zachariah in their discrimination, retaliation, and hostile work environment suit against the Secretary of the Department of Veterans Affairs (VA).[1] We must decide whether this circuit recognizes a retaliatory hostile work environment claim and, if so, whether the evidence in this case was sufficient to support the jury's verdict and damages award. We conclude that a retaliatory hostile work environment is a viable claim and, after a thorough review of the record and with the benefit of oral argument, we affirm in part and vacate and remand in part.

I. Background

This case involved a two-week jury trial, four plaintiffs, four hospital administrators and department heads, numerous witnesses, and extensive documentary evidence. We begin by identifying the plaintiffs, their claims, and the relevant members of the VA's administration. Doctors Gowski and Zachariah

---

[*] Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

[1] The jury rejected Gowski's religious discrimination claim and Zachariah's gender discrimination claims. Gowski and Zachariah do not appeal from the jury verdict on these claims.

2

were employed at the Bay Pines VA hospital and medical center in Florida. Gowski was a hospitalist who began working for the VA in 1997. In 2005, she was assigned to the medical intensive care unit (MICU). Zachariah began working for Bay Pines in 1989 as a neurologist and researcher and is an associate professor of neurology at the University of South Florida.

At the relevant times, Dr. Sharachandra Patel was the chief hospitalist and Gowski's immediate supervisor. Dr. Lithium Lin was the chief of medicine services. Dr. George Van Buskirk was Bay Pines's chief of staff. Wallace Hopkins was Bay Pines's director. Bay Pines's medical departments were divided into services, such as medicine, surgery, geriatrics, and mental health. Services were comprised of sections of specific fields, such as pulmonology, cardiology, and hospitalists. At Bay Pines, neurology became its own service in 2002, but was realigned as a section in medicine services in 2006. While neurology was a section in medicine services, Lin was Zachariah's supervisor.

In August 2007, Gowski and Zachariah, along with Dr. Claudia Cote and administrative assistant Roxanne Lainhart Bronner, who are not parties to this appeal, filed a complaint in district court against the Secretary, alleging retaliation and a retaliatory hostile work environment.[2] Gowski alleged that the hospital

_____

[2] Dr. Claudia Cote and Roxanne Lainhart Bronner were successful on their retaliation and hostile work environment claims at trial. The Secretary does not appeal from those verdicts

administration retaliated against her after she filed an EEO complaint in October 2005 by changing her duty assignments, removing her from committee chair positions and taking her off committees altogether, denying her privileges, reprimanding her, counseling her and suspending her, refusing to investigate her allegations against another doctor, soliciting complaints about her, lowering her proficiency reports, accusing her of an altercation with another doctor, and charging her $18,000 for an alleged debt incurred eight years earlier.

Zachariah alleged that, after she filed EEO complaints in June 2005 and April 2006, Bay Pines's administration retaliated against her by lowering her proficiency reports, giving her smaller bonuses than those her colleagues received, suspending her research activities, shortening the time for which her privileges were approved, realigning neurology as a section under medicine services, removing her from the rotation as section chief, identifying her as a participant in a tort claim, removing her as leader of the stroke group, issuing a reprimand for negligence, suspending her and recommending her termination, and denying her access to the grievance and appeals process.

II. The Trial[3]

_____

and thus we do not discuss these claims.

[3] Because we are reviewing the denial of the Secretary's motion for judgment as a matter of law, we recite the evidence here in the light most favorable to the plaintiff doctors and disregard evidence favorable to the Secretary that the jury was not required to believe. *Reeves v.*

A. The Retaliatory Scheme

At trial, Gowski and Zachariah alleged that Bay Pines's management "made a concerted effort to retaliate against employees who filed EEO claims against them, or opposed their discriminatory or retaliatory actions." The evidence showed that Van Buskirk and Hopkins did not look highly on employees who filed EEO complaints and carried out a plan to remove these employees from Bay Pines's staff. As part of the scheme, Lin, Patel, and Van Buskirk (a) targeted employees who filed complaints, (b) spread rumors about the doctors, (c) attempted to ruin the doctors' reputations and careers, and (d) collected reports against those who filed complaints in an effort to terminate them. For his part, Hopkins warned staff members that the VA would not settle frivolous complaints and lawyers would not run the hospital. To carry out his part in the scheme, Lin enlisted Bronner to urge Gowski and Zachariah to resign, and he used Patel as a "mole" to obtain Reports of Contact (ROC) from other staff and to disseminate negative information about both Gowski and Zachariah.

Other doctors and staff members were aware of the scheme and, between 2006 and 2007, many of Bay Pines's doctors left the hospital out of fear of being targeted. Doctors and nurses were told to submit ROCs on their interactions with

_Sanderson Plumbing Prod._, 530 U.S. 133, 148-51 (2000).

5

Gowski and Zachariah with Patel sometimes dictating what the staff should write. Several staff members testified that if they did not go along with Patel and Lin's scheme, they would be targeted as well.

B. Gowski's Claims

Gowski testified that Bay Pines was a hostile work environment full of fear and retaliation. She felt that Lin, Patel, and Van Buskirk engaged in character assassination, solicited complaints from other staff, questioned her ethics, and harmed her reputation.

Gowski had trained in critical-care medicine and worked in the MICU until July 2005, when Patel informed her that she would rotate assignments in two-month cycles; she would work on the general medical wards for two months and then spend two months in the MICU.[4] But by June 2006, after Gowski had filed her EEO complaint, Lin and Patel refused to allow Gowski to rotate through the MICU. And when Lin and Patel arranged to provide hospitalist coverage for cardiology in January 2007, Gowski was not one of the hospitalists assigned.

Gowski was appointed to the Critical Care Committee in 2003 and she became the committee chair in November 2004. Although the usual term for a

---

[4] Gowski did not allege that her removal from MICU was retaliatory; she claimed it was based on religious discrimination. But we mention it here because she raises these events as part of her claim for injunctive relief and as an example of the inconsistent jury verdict.

6

committee chair was two years, Gowski was removed from the position in July 2005.[5]  By January 2006, she was not even a member of the Critical Care Committee.  Gowski was also a member of the Code Blue Committee, and although she expressed an interest in being the committee chair, she was not selected.  When she learned another doctor had been appointed, she questioned the appointment during a committee meeting.  After the meeting, members of the committee complained that Gowski's behavior had been aggressive and confrontational.

In April 2006, Gowski sought to renew her hospital privileges.  Although Patel and Lin initially signed off on all the privileges she requested, she later learned that the Professional Standards Board (PSB) had not approved certain privileges necessary to her work in the critical-care units.  Because it was advantageous to patient care to have a critical-care certified hospitalist, and because the loss of privileges would make it difficult to retain her critical-care certification, Gowski believed the decision to limit her privileges was part of the retaliatory scheme.  Lin presented her application to the PSB, and Van Buskirk was the PSB chair.

---

[5] Gowski later explained that her removal was religious discrimination and not retaliation.  Like the removal from the MICU, this incident is relevant to Gowski's later claims of error.

In July 2006, Gowski attended a hospitalist meeting at which Patel discussed the pending move of the neurology department into the medicine service. Gowski had many concerns about the procedures following the move, and, although she emailed Lin and Patel about them prior to the meeting, she had not received a response. After she reiterated her concerns at the meeting, she was reprimanded for disruptive behavior and unprofessional conduct. A few weeks later, she was reassigned to ward 5-A.

Shortly thereafter in December 2006, Gowski learned that her personnel file showed that she had been involuntarily terminated in 1999. When she inquired about correcting the error, she was told that if she made the changes to show she had voluntarily resigned, she would owe $18,000 that she had received as speciality pay. She applied for a waiver of liability so that she would not have to repay, but Hopkins denied her request.

In April 2007, Lin issued a proposed a two-week suspension based on a pattern of unprofessional conduct in connection with an incident with nurse Mary Howell. Howell accused Gowski of being disrespectful when a patient in her care needed to be moved to another unit. Lin did not interview Gowski before recommending the suspension. Hopkins reviewed Lin's recommendation and issued the suspension for one week instead of two. The only evidence Hopkins

8

considered was Gowski's prior reprimand, but Gowski had not been interviewed before that reprimand either.

In August 2007, Gowski made a comment during a meeting about another doctor's plans to leave Bay Pines. Lin and Patel gave her a verbal counseling for invading the privacy of another doctor and warned her that termination would be next.

### C. Zachariah's Claims

Zachariah felt the hostility at Bay Pines daily. The environment was so retaliatory, she would sometimes break down and cry. Zachariah was the chief of the neurology service until 2006, when Van Buskirk realigned neurology as a section under medicine services in retaliation for complaints she had filed. Once neurology was moved into medicine services, the position of section chief was to rotate among the neurologists, but Zachariah was not included in the rotation. She also was not permitted to attend every grand rounds because attendance would rotate among all the members of the neurology section. When she asked Van Buskirk about the department move, he told her it was due to a backlog of EEGs and the availability of out-patient clinics. But the decisions were purely retaliatory, and Lin, who was chief of the medicine service, was not reprimanded for the alleged backlog.

When Zachariah was removed as service chief, her salary decreased by $20,000.  Although the compensation committee was responsible for determining salary, Van Buskirk, as chair of the committee, used it to make his decisions.

In 2005, Zachariah developed a research study to review how migraine patients responded to the use of Botox as treatment.  The study was a retrospective review of patient charts to ascertain results.  Zachariah approached a member of the Institutional Review Board (IRB) and received approval for the study even though a retrospective study would be exempt from IRB regulations.

The IRB committee was hand-picked by Lin and Van Buskirk.  It later determined that Zachariah conducted the study without approval, suspended her from engaging in any research for one year, and placed her on lifetime probation.  The Research and Development Committee (R&D) increased the punishment to a two-year suspension.  Van Buskirk and Hopkins were present at the committee meeting to address Zachariah's research.[6]  No one ever told Zachariah that the protocol she submitted for approval was incomplete, and no one else was punished for the oversight.  Lin also punished Zachariah for publishing her research results without approval.  When she tried to appeal the R&D's punishment, she learned

---

[6] Hugo Fernandez, the associate chief of staff for research at the time of Zachariah's discipline, testified that, in prior cases, the IRB would allow retroactive approval.  But Van Buskirk, who was present at the R&D meeting, likely influenced the committee to deny approval.

10

that another of her studies was under investigation, although no wrongdoing was found. After the investigation, Lin tried to suspend Zachariah, but the suspension was overturned. Zachariah's remaining studies were given to other doctors.

After the problems with her research, and around the time she filed her 2006 EEO complaint, Zachariah learned that she had to renew her hospital privileges. Although privileges were usually approved for two-year terms, she was forced to renew her privileges every few months due to a "cloud in her research." Van Buskirk used the privilege renewal as punishment.[7]

Zachariah was punished every few weeks after she filed her EEO complaints. She was counseled because, she was told, she did not request medication correctly. She was removed from the stroke committee despite all of her work in getting Bay Pines stroke-certified. In fact, once Bay Pines received its certification, Lin appointed another doctor, who was not a stroke specialist like Zachariah, as director.

Then, in July 2007, Lin requested that Zachariah be suspended for numerous issues, many of which related to the Botox study for which she had already been punished. She was written up for conduct unbecoming a federal employee when she made a notation about hospital policy in a patient's chart. Bay Pines's

_____

[7] According to PSB member Charles Hirt, at the meeting to review Zachariah's privileges, Van Buskirk portrayed Zachariah as a bad doctor.

administration then listed her name as one of the doctors involved in a tort claim, but it was later determined that she was not involved in the claimant patient's care.

Lin later requested that Zachariah be terminated in connection with his investigation into some of her patient files. To show that such files were routinely kept, Zachariah brought a disposable camera to work and photographed files without capturing any patient information. Sylvia Russell, who had alerted Lin to the existence of the files, wrote an ROC claiming that she saw Zachariah taking photos. Russell received a bonus and a promotion after writing the ROC on Zachariah. No one else who kept similar files was punished.

Zachariah believed that all of the discipline was due to her EEO complaints. She felt disgraced and suffered sleepless nights awaiting the next punishment.

C. Procedural Matters

At the close of the doctors' case and again at the close of all the evidence, the Secretary moved for judgment as a matter of law under Rule 50. The court denied the motion and allowed the retaliation and hostile work environment claims to go to the jury. The doctors requested that the jury be instructed that each incident of retaliation was a separate claim. The court stated that it would instruct the jury that the doctors had to prove that "one or more" of the retaliatory acts occurred. Counsel indicated that this instruction was acceptable.

In closing argument, after listing the retaliatory actions alleged, the doctors' counsel stated:

> [I]f you find one of those adverse acts were the result of that retaliation, and when you get to the verdict form you mark, yes, there's retaliation. You do it whether you find one or all of them. So, each of them have their own separate claim. So, if you find one of the retaliation actions, then you'll find retaliation.

Addressing damages, counsel stated that Gowski incurred damages in the amount of $15,250 for the failure to receive market pay and for her suspension. Zachariah lost $6,730 during her suspension and $82,364 for her loss of the section-chief position.

The Secretary argued in closing that there was no retaliation and that the doctors simply second-guessed management's decisions and wanted to run the hospital. In rebuttal, the doctors' counsel stated, "each of those claims are separate claims . . . of retaliation. If you find one of them, you check off yes for retaliation."

After listing each of the doctors' claims, the court instructed the jury that the doctors were required to prove "[t]hat one or more adverse employment actions occurred." The court then explained the verdict form, which set out each plaintiff's claims separately. In a sidebar discussion, the doctors' attorneys stated that they still believed the retaliation description should clearly state that each

13

incident was a separate adverse employment action. The court disagreed because this was mentioned clearly in the plaintiffs' closing argument and in the court's instructions.

During its deliberations, the jury asked whether it was answering for all plaintiffs or for each individual. The doctors' counsel again raised the issue of the jury instruction, but the court stated that the jury was not asking about each act of retaliation. The jury found that Gowski and Zachariah experienced retaliation, but that the Secretary would have taken the same actions even in the absence of the protected activity. The jury also found that both doctors experienced a retaliatory hostile work environment. The jury awarded Gowski $250,000 in emotional damages and $16,000 in lost wages. The jury awarded Zachariah $1,000,000 in emotional damages and $90,000 in lost wages.

III. Post-trial Motions

A. Judgment as a Matter of Law

The Secretary filed a post-verdict motion for judgment as a matter of law under Rule 50, arguing that, even if a retaliatory hostile work environment claim was cognizable in the Eleventh Circuit, discrete acts of retaliation could not form the basis of the claim. Thus, the Secretary argued, the doctors' claim failed because the only evidence they put forth were the discrete acts.

14

The district court denied the judgment as a matter of law, finding that the Eleventh Circuit would recognize a hostile work environment claim, and the court found sufficient evidence of it in this case.

B. Remittitur

The Secretary requested a remittitur of the damages amount, or a new trial on damages, because the amount found by the jury exceeded what was established by the evidence. The Secretary noted that, under 42 U.S.C. § 1981a(b)(3)(D), compensatory damages were capped at $300,000. Because Zachariah's emotional damages amount exceeded the cap, it must be remitted. Additionally, Zachariah's damage award was due to be reduced because there was no evidence to show emotional distress given her testimony. Finally, the Secretary asserted that Gowski's award was not supported by the evidence.

The court found that lost wages were not recoverable in a hostile work environment case unless the plaintiff has been constructively discharged.[8] Considering the amounts found by the jury, the court concluded that the jury was attempting to award lost wages on the hostile work environment claim, which was precluded as a matter of law. Accordingly, the court vacated the awards of lost

_____

[8] Although the doctors argued that the Secretary waived any objection to the lost-wages award, we disagree. *See Akouri v. Fla. Dep't of Transp.*, 408 F.3d 1338, 1344 (11th Cir. 2005) (explaining that, although the defendant had raised objection to damages instruction at charge conference, the district court found it was better raised in a post-verdict motion).

15

wages. The court declined to remit the damages further, finding that the awards were "neither grossly excessive nor shocking to the conscience."

C. The Doctors' New Trial Motion

The doctors moved for a new trial on the retaliation claims, arguing that the jury verdicts were inconsistent. Specifically, the doctors noted that the jury found in favor of co-plaintiff Claudia Cote, but applied the same-decision defense to Gowski on the same issue.[9] They also argued that they were entitled to a new trial due to the court's failure to give the requested jury instruction. The court denied the motion, finding that the jury verdicts were consistent. The court also found no error in the jury instructions because the instructions, as given, covered the doctors' concerns, and counsel repeatedly stated in closing argument that each act of retaliation was a separate claim.

D. Injunctive Relief

On the doctors' motion, the district court granted equitable relief as follows: (1) prohibiting any retaliatory practices; (2) preventing the Secretary from taking any disciplinary action against the doctors for three years unless approved by independent review; (3) ordering the VA staff to participate in discrimination

---

[9] The plaintiffs argue that the inconsistency arises from the jury's verdict that the Secretary retaliated against Cote by removing Gowski from the MICU, but applied the same decision defense to Gowski. The flaw in this argument is that Gowski's removal was not part of Gowski's retaliation claim – she claimed it was religious discrimination, which the jury rejected.

16

workshops and post the verdict; (4) removing  the doctors' disciplinary files and preventing their use in any further disciplinary action; (5) ordering that the doctors be appointed to additional hospital committees; (6) ordering that Gowski be placed back on the rotation for duty assignments and be permitted to obtain the necessary credentials and privileges to do so; and (7) ordering that Zachariah be permitted to continue her research.  The Secretary opposed equitable relief on the ground that the jury applied the same-decision defense.

IV. Appeal

The Secretary now appeals, raising four issues: (1) the district court erred by denying the motion for judgment as a matter of law; (2) the district court erred by denying the motion for remittitur; (3) the district court abused its discretion in awarding injunctive relief; and (4) the plaintiffs were not entitled to attorneys' fees. The doctors cross-appeal, raising two issues: (1) they were entitled to a new trial on the retaliation claims; and (2) the district court erred by vacating the award for lost wages.[10]

---

[10]  After reviewing the record, and with the benefit of oral argument, we affirm three issues without further discussion.  First, we affirm the award of attorneys' fees because the plaintiffs in this case were a prevailing party and, as such, were entitled to fees.  42 U.S.C. § 2000e-5(k).  In addition, we conclude that the district court properly vacated the lost wages awards because there is no dispute that Gowski and Zachariah were not constructively discharged.  *See Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 (3d Cir. 2006) (holding that a hostile work environment claim alone, in the absence of a successful constructive-discharge claim, is insufficient to support an award for lost wages); *Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1236-37 (10th Cir. 2000) (same).  Moreover, to the extent that the

17

A. Standards of Review

We review the denial of a motion for judgment as a matter of law *de novo*. *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 582 (11th Cir. 2000). We review the district court's decision to grant equitable relief for abuse of discretion, underlying questions of law *de novo*, and findings of fact under the clearly erroneous standard. *Preferred Sites, LLC v. Troup Cnty.*, 296 F.3d 1210, 1220 (11th Cir. 2002).

We review jury instructions for abuse of discretion and give trial judges "wide discretion as to the style and wording employed." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1329 (11th Cir. 1999). We review jury instructions *de novo* to determine whether they misstate the law or mislead the jury. *Conroy v. Abraham Chevrolet-Tampa, Inc.*, 375 F.3d 1228, 1233 (11th Cir. 2004). Motions for new trial on the basis of erroneous and prejudicial jury instructions are within the district court's discretion and are reviewed for abuse of discretion. *Pate v.*

awards reflect lost wages for discrete events to which the same-decision defense applied, damages were not available as a matter of law. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1270 (11th Cir. 2001); *see also* 42 U.S.C. § 2000e-5(g)(2)(B). Finally, we conclude that the district court properly declined to further remit the damages. The jury initially awarded Gowski $250,000 and Zachariah $1,000,000 in emotional damages. Zachariah's award was remitted to $300,000 to reflect the statutory cap. As a general rule, "a remittitur order reducing a jury's award to the outer limit of the proof is the appropriate remedy where the jury's damage award exceeds the amount established by the evidence." *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1266 (11th Cir. 2008) (internal citation omitted). Where a district court has already "invoked its discretion in granting a remittitur, our scope of review is even narrower than usual." *Stapleton v. Kawasaki Heavy Indus., Ltd.*, 608 F.2d 571, 574 n.7 (5th Cir. 1979). Given our limited scope of review, we cannot say the court abused its discretion by declining to reduce the award further.

18

*Seaboard R.R., Inc.*, 819 F.2d 1074, 1077 (11th Cir. 1987).

B. The Secretary's Motion for Judgment as a Matter of Law

Under Rule 50, a court should render judgment as a matter of law when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. Fed. R. Civ. P. 50. We review all of the evidence in the record and draw all reasonable inferences in favor of the nonmoving party. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192-93 (11th Cir. 2004) (citing *Reeves v. Sanderson Plumbing Prod.*, 530 U.S. 133, 148-51 (2000)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves*, 530 U.S. at 150; *see also Owens v. Wainwright*, 698 F.2d 1111, 1113 (11th Cir. 1983) ("Appellate courts reviewing a cold record give particular deference to credibility determinations of a fact-finder who had the opportunity to see live testimony."). "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151. "[I]f there is substantial conflict in the evidence, such that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion must be denied." *Christopher v. Florida*, 449 F.3d 1360, 1364 (11th Cir. 2006) (internal citations and quotation marks

omitted).

Title VII prohibits employers from retaliating against an employee "because [s]he has opposed any . . . unlawful employment practice . . . or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, the plaintiff must show that (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) there was a causal link between the two.[11] *Dixon v. The Hallmark Companies, Inc.*, 627 F.3d 849, 856 (11th Cir. 2010). To establish a hostile work environment claim under Title VII, the plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

> 1. Does the Eleventh Circuit recognize a claim for retaliatory hostile work environment?

This court has yet to recognize a retaliatory hostile work environment claim. But every other circuit does. *See Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 928-

---

[11] The parties agree that Gowski and Zachariah engaged in a protected activity.

20

29 (8th Cir. 2007); *Jordan v. City of Cleveland*, 464 F.3d 584, 598 (6th Cir. 2006); *Jensen v. Potter*, 435 F.3d 444 (3d Cir. 2006), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *Hussain v. Nicholson*, 435 F.3d 359, 366-67 (D.C. Cir. 2006); *Noviello v. City of Boston*, 398 F.3d 76, 88 (1st Cir. 2005); *Von Gunten v. Maryland*, 243 F.3d 858, 864-65 (4th Cir. 2001), *arbrogated on other grounds by Burlington N.*, 548 U.S. 53; *Ray v. Henderson*, 217 F.3d 1234, 1244-45 (9th Cir. 2000); *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir. 1999), *abrogated on other grounds by Burlington N.*, 548 U.S. 53; *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264 (10th Cir. 1998); *Knox v. Indiana*, 93 F.3d 1327, 1334-35 (7th Cir. 1996).[12]

We now join our sister circuits and recognize the cause of action. Doing so is consistent with the statutory text, congressional intent, and the EEOC's own interpretation of the statute. *See Noviello*, 398 F.3d at 89-90; *see also* 42 U.S.C. § 2000e-2(a); EEOC Compl. Man. (CCH) ¶ 8005, § 8-II.D.3 (2004). As the First Circuit explained,

> Given Congress's intention to strike at the entire spectrum of disparate
> treatment of men and women in employment, which includes

---

[12] The Fifth Circuit recognized the cause of action under the Energy Reorganization Act's whistleblower provision. *Williams v. Admin. Review Bd.*, 376 F.3d 471, 476-77 (5th Cir. 2004).

requiring people to work in a discriminatorily hostile or abusive environment, it makes sense to construe the qualifier (regarding "compensation, terms, conditions, or privileges of employment") broadly. On that basis, the verb "discriminate," as used in section 2000e-2(a)(1), logically includes subjecting a person to a hostile work environment . . . . Title VII's anti-retaliation provision . . . directs an employer not to discriminate against any employee "because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Here, the term "discriminate" appears without the qualifier. A familiar canon of construction teaches that a term appearing in several places in a statutory text is generally read the same way each time it appears. We apply that canon here. The result: the verb "discriminate" in the anti-retaliation clause includes subjecting a person to a hostile work environment.

*Noviello*, 398 F.3d at 89-90 (internal quotation marks and citations omitted).

Additionally, it is consistent with Title VII's remedial goal and prevents supervisors from deterring protected conduct. *Id.* Accordingly, we hold that this circuit recognizes a cause of action for retaliatory hostile work environment.

> 2. Is there sufficient evidence of the retaliatory hostile work environment?

Having recognized the cause of action, we must review whether the evidence in this case was sufficient to establish the claim. Here, the question is whether a reasonable jury could have found that the Secretary, through Lin, Patel, and Van Buskirk, subjected Gowski and Zachariah to a hostile work environment in retaliation for their EEO activity. To so find, the jury had to conclude that the actions complained of were sufficiently severe or pervasive to alter the terms and

22

conditions of employment, thus constituting an adverse employment action.

The requirement that the harassment be "severe or pervasive" contains an objective and a subjective component. *Miller*, 277 F.3d at 1276. "Thus, to be actionable, this behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s] . . . to be abusive." *Id.* (internal quotation marks omitted). In evaluating the objective severity of the harassment, this court looks at the totality of the circumstances and considers, among other things: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.* "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Harris*, 510 U.S. at 23.

Discrete acts cannot alone form the *basis* of a hostile work environment claim. *See Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 970 (11th Cir. 2008) (emphasis added); *see also McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008) (as opposed to "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire," a hostile work environment claim addresses acts "different in kind" whose "very nature involves repeated conduct," such as

23

"'discriminatory intimidation, ridicule, and insult.'" (quoting *Nat'l R.R. Passenger Corp.*, 536 U.S. at 117)). But the jury could *consider* discrete acts as part of a hostile work environment claim. *See, e.g.*, *Nat'l R.R. Passenger Corp.*, 536 U.S. at 117 (a hostile work environment claim depends on "a series of separate acts that collectively constitute one 'unlawful employment practice.'" (internal citation omitted)); *see also Chambless v. Louisiana-Pacific Corp.*, 481 F.3d 1345, 1349-50 (11th Cir. 2007) (discussing, for timeliness purposes, discrete acts that are sufficiently related to a hostile work environment claim that they can be considered part of the same claim).

The Secretary argues that the discrete acts in this case cannot be considered as part of the hostile environment because the retaliatory intent was not the "but-for" cause where the jury applied the same decision defense. Although the Secretary is correct that the retaliation must be the "but-for" cause, we cannot agree that the same-decision defense eliminates such causation in a hostile work environment claim. As it does in every case in which the same-decision defense applies, the jury here found that the discrete acts were motivated in part by retaliatory animus. Although that may be sufficient under the same-decision defense to preclude liability for each of the acts individually, it is not enough to eliminate liability for the hostile environment caused by the retaliatory animus

24

when the discrete and non-discrete acts are taken collectively. To allow the same-decision defense to eliminate but-for causation in a hostile work environment claim would essentially do away with the claim. Thus, although the same-decision defense eliminates but-for causation for each discrete action, it does not eliminate the but-for causation that matters in a retaliatory hostile work environment claim – that is, the severe and pervasive accumulation of actions that would not have occurred but-for the retaliatory reason, even if each action alone was justifiable.

Having reviewed the testimony in this trial, and giving proper deference to the jury's credibility determinations, we conclude that the district court properly denied the motion for judgment as a matter of law. Although reasonable people could disagree about the evidence, there was enough for the jury to conclude that Lin, Patel, and Van Buskirk created a workplace filled with intimidation and ridicule that was sufficiently severe and pervasive to alter Gowski and Zachariah's working conditions. And although the discrete acts of retaliation played a role in the intimidation and ridicule, they were certainly not the only conduct that supported the hostile work environment claim. The evidence here showed that the administration intended to retaliate against Gowski and Zachariah because of their EEO activity and then created a hostile environment by spreading rumors about the doctors, damaging their reputations, and disciplining them. The administration

25

solicited ROCs on Gowski and Zachariah, instructed other employees to encourage the doctors to resign, and attempted to malign them in front of their peers and co-workers. This scheme was visible to other hospital staff in their day-to-day work in the units, as was the toll it took on Gowski and Zachariah personally.

And this scheme was both severe and pervasive. There was testimony that the retaliatory intent was well-known and continued over a period of years. Gowski and Zachariah were targeted with a campaign to force them to resign by limiting their privileges and their access to positions within the hospital. They were removed from committees and projects, prohibited from conducting research, reassigned to different wards, and given low proficiency ratings. Other doctors testified to the scheme, with some admitting that they were afraid to testify for fear of retaliation. And although it did not deter Gowski and Zachariah from filing complaints, several other staff members testified that they chose not to file EEO claims out of fear.

In light of this evidence, we agree that the evidence was sufficient to support the jury's verdict on the retaliatory hostile work environment claim.

### C. Injunctive Relief

"The purpose of Title VII relief is to 'make whole' victims of unlawful discrimination." *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1363 (11th

26

Cir. 1994) (internal quotation marks omitted). The statute vests "broad equitable discretion" in a federal court to fashion the "most complete relief possible." *Id.*

The injunctive relief here included: (1) prohibiting any retaliatory practices; (2) preventing the Secretary from taking any disciplinary action against the doctors for three years, unless approved by independent review; (3) ordering the VA staff to participate in discrimination workshops; (4) removing of the doctors' disciplinary files and preventing their use in any further disciplinary action; (5) ordering that the doctors be appointed to additional hospital committees; (6) ordering that Gowski be placed back on the rotation for duty assignments and be permitted to obtain the necessary credentials and privileges to do so; and (7) ordering that Zachariah be permitted to continue her research.

The Secretary contends, and we agree, that no injunctive relief is available when a defendant prevails in a mixed-motive retaliation case. *See* 42 U.S.C. 2000e-(g)(2)(B). Although such relief would be available in a mixed-motive discrimination claim, retaliation is not listed in the statute addressing injunctive relief for mixed-motive claims.

Thus, the court here was limited in the relief it could fashion. We cannot say that the court abused its discretion when it prohibited any retaliatory practices, instructed that the verdict be posted, prevented the Secretary from taking any

disciplinary action against the doctors for three years unless approved by independent review, and ordered VA administration and staff to participate in discrimination workshops. This relief relates directly to the hostile work environment and scheme to retaliate against the doctors.

The remaining relief ordered by the court is a closer call, as it relates to the discrete instances of retaliation for which the jury applied the same-decision defense. Although we concluded that the jury could consider discrete acts as part of the hostile work environment, those discrete acts cannot be remedied due to the mixed-motive involved.[13] *See* 42 U.S.C. § 2000e-5(g)(2)(B). Accordingly, we vacate in part the injunctive award.

### D. The Doctors' New Trial Motion

We examine jury instructions as a whole to determine whether they fairly and adequately addressed the issue and correctly stated the law. *Christopher v. Cutter Lab.*, 53 F.3d 1184, 1190 (11th Cir. 1995). "Jury instructions must be put in context; we consider the allegations of the complaint, the evidence presented, and the arguments of counsel when determining whether the jury understood the issues or was misled." *Id.* at 1190-91. "The purpose of jury instructions is to give the jury a clear and concise statement of the law applicable to the facts of the case."

---

[13] We disagree with the plaintiff-appellants that Gowski can be reassigned to MICU as part of co-plaintiff Claudia Cote's remedy. Cote's remedies are not before us in this appeal.

*Id.* at 1194 (internal citation omitted. "If there is no basis in the record for the instruction given, such error may raise a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations, and reversal may be required." *Id.* (citation and internal quotation marks omitted). "If the totality of the instructions properly express the law applicable to the case, there is no error even though an isolated clause may be inaccurate, ambiguous, incomplete or otherwise subject to criticism." *Id.* (internal quotation marks and citation omitted).

Considering the record as a whole, we see no reversible error in the jury instructions.[14] The instructions indicated the jury was to consider one or more actions, and the court listed each allegation of retaliation for the jury to consider. We presume a jury follows its instructions. *Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192, 1201 (11th Cir. 2004). Additionally, both parties in closing arguments reminded the jury that it could consider each separate act in the retaliation claim. The jury's answers to the interrogatories on the verdict form were consistent with each other and with the verdict as a whole. This is not a case in which the jury rendered inconsistent verdicts. *See* Fed. R. Civ. P. 49 (addressing inconsistencies

---

[14] We note that the verdict form mirrored the form requested by the plaintiff doctors, arguably rendering any error here invited. *In re Carbon Dioxide Indus. Antitrust Litig.*, 229 F.3d 1321, 1327 (11th Cir. 2000) ("It is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party." (internal quotation marks and citation omitted)).

in general and special verdicts); *see also Wilbur*, 393 F.3d at 1200-02 (describing a case in which the jury found in favor of the defendant on the plaintiff's claims of harassment and retaliation but nevertheless awarded the plaintiff damages). Accordingly, the district court properly denied the doctors' motion for a new trial.

VI. Conclusion

For the foregoing reasons, we affirm the district court's denial of the motion for judgment as a matter of law and for a new trial, the remittitur, the vacatur of the lost-wages award, and the award of attorneys' fees. We also affirm in part the grant of injunctive relief, but remand in part the injunctive award with instructions for the district court to strike the award as it pertains to the removal of the doctors' disciplinary files and the prevention of their use in any further disciplinary action; the order that the doctors be appointed to additional hospital committees; the order that Gowski be placed back on the rotation for duty assignments and be permitted to obtain the necessary credentials and privileges to do so; and the order that Zachariah be permitted to continue her research.

**AFFIRMED in part, VACATED and REMANDED in part.**