[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-14169
Non-Argument Calendar
_____

D.C. Docket No. 1:12-cv-20492-PAS

ROSA GALDAMEZ,

Plaintiff-Appellant,

versus

DHL AIR EXPRESS USA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(August 25, 2014)

Before HULL, MARTIN and FAY, Circuit Judges.

PER CURIAM:

Rosa Galdamez appeals the district court's grant of summary judgment to

her employer DHL Air Express USA ("DHL") on her gender-based discrimination

and hostile work environment claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1), and her retaliation claim under Title VII, 42 U.S.C. § 2000e-3(a).  After careful review of the record and the parties' briefs, we affirm.

## I.  BACKGROUND

### A.    Facts

Since 2000, plaintiff Rosa Galdamez, a female, has worked for defendant DHL, a global air freight company, at its Miami International Airport location.  As a unionized employee, Galdamez's rights are governed by a collective bargaining agreement.

For most of her employment with DHL, Galdamez has worked as an International Service Agent.  International Service Agents' jobs are physically demanding, involving lifting heavy objects and complying with tight time restrictions to ensure that parcels get on the right flight at the right time.[1] Galdamez worked on a team of more than 20 International Service Agents, most of whom were men.

From May to July 2010, Galdamez's team was supervised by Robert St. George.  Sometime in July 2010, Jennifer Campbell became Galdamez's direct

---

[1]From 2005 to 2008, Galdamez held the position of lead agent, which involved additional responsibilities and compensation as compared to a non-lead agent.  In 2008, she voluntarily resigned from the lead agent position and returned to her position as a non-lead agent because, according to her, St. George was "hostil[e]" towards her in the position of lead agent.  On appeal, she concedes that any claim based on her returning to the non-lead position is time-barred.

2

supervisor.  After that point, St. George continued to indirectly supervise Galdamez because he and Campbell supervised teams that performed related functions.

While under St. George's direct supervision, Galdamez injured her knee on May 6, 2010 and requested a light duty assignment.  St. George denied Galdamez's request, and for the next four weeks, Galdamez performed full duty work, but was then placed in a light duty position.

After Galdamez's attorney complained to DHL, St. George criticized Galdamez's work performance.

Galdamez later filed a union grievance and then an Equal Employment Opportunity Commission ("EEOC") charge of discrimination.  Subsequently, supervisor Campbell reprimanded Galdamez two times in writing: once for failure to follow proper scanning procedures for incoming shipments and once for attendance and tardiness issues.

## B.    Galdamez's Lawsuit

On February 7, 2012, Galdamez brought this lawsuit in the district court. Galdamez alleged, inter alia, that DHL: (1) discriminated against her when St. George denied her request for light duty work; (2) retaliated against her when St. George criticized her performance and Campbell issued two written reprimands; and (3) subjected her to a hostile work environment based on St. George's conduct

as her supervisor.  After extensive discovery, the district court granted DHL's

motion for summary judgment.[2]

Galdamez timely appealed.[3]  We address each claim in turn.

## II.  GENDER DISCRIMINATION CLAIM

### A.    DHL's Light Duty Program

DHL had a light duty work program where "injured employees [were]

eligible for non-strenuous job assignments until they recover[ed] from injury."

However, in April 2010, DHL decided to end its light duty program on July 17,

2010, as was its right under the collective bargaining agreement.[4]  DHL, however,

did not announce this change to its employees until June 2010.

### B.    Galdamez's May 2010 Injury and Request for Light Duty Work

On May 6, 2010, while working her shift at DHL, Galdamez tripped, fell to

the ground, and injured her knee.  On May 13, 2010, Galdamez saw a physician

---

[2]Galdamez's complaint also asserted race and national origin claims.  On appeal, Galdamez does not challenge the district court's entry of summary judgment as to these claims and, thus, has abandoned them.  See Rioux v. City of Atlanta, 520 F.3d 1269, 1274 n.4 (11th Cir. 2008).

[3]We review a district court's grant of summary judgment de novo, viewing all evidence and drawing all reasonable inferences in favor of the non-moving party.  Chapter 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1254 (11th Cir. 2012).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

[4]DHL decided to terminate its light duty program because its Miami airport operations were negatively impacted "as supervisors attempted to find work for those on light duty and to find sufficient manpower to complete strenuous activities."  It waited until July 17 to terminate the program because that was the start of a new six-month shift period.

who gave Galdamez a medical note (1) restricting her from lifting more than 20 pounds, from pushing and pulling heavy loads, and from squatting and climbing and (2) limiting her to walking and standing for seven hours a day, with breaks if needed.

Galdamez gave the medical note to Supervisor St. George and requested a light duty assignment.  St. George told Galdamez "I don't care about your medical note, you will keep working full duty."  Galdamez continued working in her full duty position from May 13 to early-June 2010, for approximately 28 days.[5] Galdamez learned that Justin Lopez and Antonio Moran—males working under a different supervisor—had light duty assignments.

In early-June 2010, Galdamez complained to Ken Grace, DHL's General Manager, about St. George's denial of her light duty request.  The next day, DHL placed Galdamez on light duty, where she remained until July 16, 2010.

On July 16, 2010, the day before DHL's light duty program ended anyway, Galdamez's physician cleared her to return to full duty work.  Galdamez's medical release note stated that she had no permanent injury and her pain was gone.

---

[5]In May 2010, Galdamez spoke with DHL's human resources representative about the denial of light duty work, but the representative informed Galdamez that she needed to arrange for a light duty assignment with the union or her supervisor, St. George.  Galdamez also spoke to her union representative, but he told her to continue working a full duty assignment and that he could not do anything about it.

However, despite this note, Galdamez testified that she continues to "have pain and flare ups" related to her injury.

In this lawsuit, St. George now admits that he incorrectly denied Galdamez's May 2010 request for a light duty assignment.  Back in May 2010, St. George believed that the light duty program ended in April 2010—when DHL actually decided to end the program—rather than on July 17, 2010—when DHL scheduled the program to end.

## C.    Legal Principles

A plaintiff typically makes a case of gender discrimination through circumstantial evidence using the burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973).  See Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010).  Under that framework, the plaintiff must first make a prima facie case of disparate treatment discrimination by showing that: (1) she is a member of a protected group; (2) she was qualified for the position she held; (3) she was subject to an adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably.  See id.; Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1325 (11th Cir. 2011).  If a plaintiff can present a prima facie case through circumstantial evidence, a presumption of discrimination arises, and the burden of production shifts to the defendant to introduce evidence of a legitimate

nondiscriminatory reason for its actions.  See Kidd v. Mando Am. Corp., 731 F.3d 1196, 1202 (11th Cir. 2013).  If the defendant satisfies this burden, the plaintiff then must show that the articulated reason is merely a pretext for discrimination.

Id.

### D. Galdamez's Gender Discrimination Claim- Lack of Comparator Evidence

The district court determined that Galdamez failed to make a prima facie case for gender discrimination because she did not show an adverse employment action.  On appeal, Galdamez argues that the denial of her light duty work request was an adverse employment action, citing Chapter 7 Trustee v. Gate Gourmet, Inc., 683 F.3d 1249 (11th Cir. 2012).  Our decision in Gate Gourmet involved a retaliation claim, not a discrimination claim.  In the retaliation context, a plaintiff satisfies the "adverse employment action" element by showing that an employer's actions might dissuade a reasonable employee from making a charge of discrimination.  Id. at 1259.  In the discrimination context, however, a plaintiff must show "a serious and material change in the terms, conditions, or privileges of employment."  Kidd, 731 F.3d at 1203 (quotation marks omitted).  Although we concluded in Gate Gourmet that the denial of light duty work was an adverse employment action sufficient to make out a prima facie case of retaliation, Gate Gourmet did not reach the issue in the discrimination context.

7

Here, we need not decide whether the denial of Galdamez's light duty request was an adverse employment action because Galdamez failed to satisfy the fourth prima facie element in any event.[6] See Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1293 n.3 (11th Cir. 2010). That is, Galdamez failed to show that DHL's employment policies were applied less favorably to her than to a similarly situated male employee, i.e., a "comparator." Smith, 644 F.3d at 1326 & n.17.

"To be an adequate comparator, the preferentially treated individual from outside the plaintiff's protected class has to be similarly situated to the plaintiff in all relevant respects." Id. at 1326 n.17. "If this is not the case, the different application of workplace rules does not constitute illegal discrimination." Id. (quotation marks omitted). Here, Galdamez's evidence indicated that two male employees had light duty assignments during the May to July 2010 time period. These male employees, however, had different supervisors than Galdamez and, thus, are not adequate comparators under the specific facts of this case.[7] See Silvera v. Orange Cnty. Sch. Bd., 244 F.3d 1253, 1261 n.5 (11th Cir. 2001) (stating

---

[6]We point out that one section of appellee DHL's brief is entitled "Pursuant to Controlling Authority, Denial of Light Duty is Not an Adverse Action in a Title VII Disparate Treatment Claim." And, under this heading, DHL states that: "Multiple courts, including this Court, have held that the denial of light duty is not an adverse employment action." However, DHL's statements are incorrect, as this Court has not decided this issue as it pertains to a Title VII disparate treatment claim. We add that, in this section of its brief, DHL does not cite any precedent from this Court. And, the cited appellate cases from other circuits are not on point to the issue before us. Although we do not reach the light duty issue here, we point out DHL's misstatement of the law of this Circuit.

[7]This result may be different, however, if St. George had authority over the two male employees' supervisors. But, the evidence does not support such an inference.

8

that "differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination," but ultimately declining to address the underlying discrimination claim); see also Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1312 n.7 (11th Cir.) (stating that individuals with different supervisors than the plaintiff "may be sufficient to prevent them from being considered 'similarly situated' with Plaintiff"), superseded in other part by, 151 F.3d 1321 (11th Cir. 1998); Jones v. Gerwens, 874 F.2d 1534, 1541 (11th Cir. 1989) (same).  Because Galdamez failed to produce evidence of a similarly situated comparator who St. George—the only decision-maker involved in Galdamez's request for a light duty assignment—treated more favorably than Galdamez, she failed to establish the fourth element of her prima facie case.

Even without "comparator" evidence, Galdamez can still prevail on her gender discrimination claim if she presents sufficient evidence that would allow a jury to infer that St. George, the decision-maker, intentionally discriminated against her by not assigning Galdamez light duty work, as DHL policies provided. See Smith, 644 F.3d at 1328.  To satisfy this alternative standard, Galdamez must present "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."  See id. (quotation marks and alteration omitted).  "An inference[] is not a suspicion or a guess.  It is a

9

reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact." Id. at 1328 n.25 (quotation marks and alterations omitted).

On this record, Galdamez's evidence is insufficient to raise an inference of gender-based discrimination. The fact that DHL, through St. George, deviated from its policies under the light duty program, standing alone, does not raise an inference of discrimination. See Mitchell v. USBI Co., 186 F.3d 1352, 1355-56 (11th Cir. 1999) ("Even assuming that USBI did deviate from its policy, this deviation does not raise an inference of discrimination. Standing alone, deviation from a company policy does not demonstrate discriminatory animus.").[8]

Galdamez's best evidence is the testimony of employee Diana Diaz Castellon who injured herself and "had to be out on medical leave." An unidentified person at DHL told Diaz Castellon that she could not have a light duty assignment. Diaz Castellon testified, however, that St. George helped the male agents when they were injured by assigning them to tasks involving little lifting, despite there no longer being a light duty program. Diaz Castellon's testimony does not indicate the males whom St. George assisted by assigning tasks involving little lifting or even when that occurred. And, there is no evidence that Diaz

---

[8]We recognize Galdamez's brief cites two gender-based comments by St. George, but they were made at unknown times and were not about Galdamez. Cf. Rojas v. Florida, 285 F.3d 1339, 1341-43 (11th Cir. 2002) (concluding that the female plaintiff's evidence—a supervisor's discriminatory comment that a non-party female employee did not deserve her job because she was a woman—was insufficient to show pretext because it was an isolated comment, unrelated to the decision to terminate the plaintiff).

Castellon ever requested that St. George assign her tasks involving lifting light objects or that he denied her request.  Thus, this evidence does not show that St. George treated males differently than he treated Diaz Castellon, much less raise an inference of gender discrimination as to Galdamez.[9]

## III.  RETALIATION CLAIMS

### A.    First Protected Activity- June 9 Letter

On June 9, 2010, before Galdamez was assigned light duty work, Galdamez's attorney sent a letter, via regular mail, addressed to DHL's Legal Department.  The letter stated that St. George's denial of Galdamez's request for a light duty assignment could be actionable under Title VII.  The letter requested that Galdamez be assigned light duty work and that her mistreatment by St. George cease or a lawsuit could be filed.  As noted above, DHL gave Galdamez light duty work in early June 2010, around the time the letter was sent.

Galdamez contends that St. George's conduct on June 10, which we discuss below, was in retaliation for her protected activity—i.e. her attorney's letter on June 9.  Galdamez's brief contends that the letter was faxed, and thus, DHL's Legal Department received it on June 9.  But, no evidence supports that assertion.  And, even if the letter arrived on June 10, the day after it was mailed, it went to the

---

[9]The remainder of Galdamez's evidence consists largely of conclusory statements that St. George treated women differently than men, but such statements, without any specific facts, lack probative value.  See Myers v. Bowman, 713 F.3d 1319, 1327 (11th Cir. 2013).

Legal Department, and there is no evidence that St. George knew about the letter on June 10. We recount the events of June 10, even though there is no evidence St. George knew about Galdamez's letter at that time.

Around noon on June 10, 2010, St. George shouted at Galdamez to come into his office. Once inside, St. George, without shouting, told Galdamez that she was not doing her job well and was socializing too frequently. St. George made the statements in front of General Manager Ken Grace, Senior Operations Manager Jeffrey Grossman, and a union representative, all of whom were also inside St. George's office.[10]

Approximately an hour later, Galdamez left DHL and went to her car in the parking lot to take her company-allowed 15-minute break. St. George then exited the building, on his way to his own car to take lunch; saw Galdamez in her car; knocked on Galdamez's car window, which she then lowered; and asked, "Where are you going?" Galdamez responded that she was taking her 15-minute break. St. George did not inquire further and left Galdamez in her car. Galdamez subjectively perceived this encounter to be physically threatening and intimidating.

St. George testified that he asked Galdamez where she was going to see if she had a doctor's appointment because it was "critical" that he knew where his

---

[10]Galdamez contends Ken Grace was present during the June 10, 2010 meeting in St. George's office, but there is no evidence supporting her contention. Because it is irrelevant to the ultimate outcome of this case, we will assume that Ken Grace was also present during that meeting.

subordinates were so that he could delegate work appropriately.  As Galdamez admits, she frequently left work throughout June 2010 for medical appointments related to her knee injury.  Galdamez testified, however, that St. George should not have asked her such questions on her company-allowed break.

In any event, St. George testified that, at the time of the June 10, 2010 encounters, he had no knowledge about Galdamez's June 9 letter.  And, more importantly, Galdamez presents no evidence to the contrary.

**B.     Second Protected Activity- June 16 Grievance and July EEOC Charge**

On June 16, 2010, Galdamez filed a grievance with her union, claiming that St. George harassed her, and specifically mentioning her June 10 encounters with St. George.  DHL investigated Galdamez's claims, even though it did not believe her grievance implicated its antidiscrimination policies.

Following the investigation, in July 2010, DHL transferred Galdamez away from St. George's supervision, assigned Campbell as Galdamez's new supervisor, and required St. George to undergo anger management training.  St. George did not directly supervise Galdamez after the July 2010 transfer.

On July 13, 2010, Galdamez signed a charge of gender discrimination, which was subsequently filed with the EEOC.[11]  The EEOC charge stated that St.

---

[11]It is unclear as to the exact date that the EEOC charge was filed.  Like the parties, we assume, for the purposes of this appeal, that it was sometime in July 2010.

13

George's May 2010 denial of a light duty assignment and his actions on June 10, 2010 were based on Galdamez's gender and constituted Title VII violations.[12]

On September 8, 2010, Jennifer Campbell gave Galdamez two written reprimands, which DHL referred to as "corrective actions."

The first Campbell-corrective action stated that Galdamez failed to follow proper scanning procedures for shipments needing clearance from U.S. Customs. DHL ultimately dismissed this corrective action as untimely.

The second Campbell-corrective action, which DHL sustained, stated that Galdamez had attendance and tardiness issues. Galdamez does not dispute that she had attendance and tardiness issues. However, she claims that these issues were related to her hypertension, which, she asserts, was exacerbated by St. George's harassment.

Galdamez alleges that St. George, rather than Campbell, authorized the two corrective actions.[13] Campbell, however, testified that she was the sole decision-maker as to the corrective actions issued. St. George testified that he played no role in the issuance of the corrective actions. Campbell testified that, at the time of

---

[12]The EEOC gave Galdamez notice of her right to sue on that EEOC charge on November 8, 2011.

[13]Galdamez claims that St. George had authority over Campbell and could direct Campbell to discipline Galdamez. In April 2011, St. George became the senior supervisor at DHL's operation at the Miami airport. Prior to that date, however, St. George did not have supervisory authority over Campbell or any other supervisor.

14

the corrective actions' issuance, she was unaware of the June 9 letter, the June 16 union grievance, and the July EEOC discrimination charge.

## C.    Legal Principles

"Title VII prohibits employers from retaliating against an employee because she has opposed any unlawful employment practice or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." Gowski v. Peake, 682 F.3d 1299, 1311 (11th Cir. 2012) (quotation marks omitted and alterations adopted). "To establish a prima facie case of retaliation, the plaintiff must show that (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) there was a causal link between the two." Id.

## D.    Galdamez's Retaliation Claims

As to Galdamez's retaliation claim, we assume, arguendo, that:
(1) Galdamez engaged in protected activity by sending the June 9 letter and (2) the June 10 encounters together constituted an adverse employment action.  Galdamez, however, has not shown a causal link between the June 9 letter and the June 10 encounters because Galdamez offered no evidence that, by the time of the June 10 encounters, St. George was aware of the June 9 letter.

Galdamez speculates that General Manager Ken Grace could have told St. George about the letter.  But, there is no evidence in this record that Grace or

15

anyone else at DHL received or learned about the June 9 letter, which was sent by regular mail, prior to the June 10 encounters, much less informed St. George prior to that meeting.[14]

Galdamez also has not shown a causal link between her other claimed protected activity and the Campbell-corrective actions.  Galdamez offered no evidence to rebut Campbell's testimony that she was the "sole decision-maker" in issuing the corrective actions and that St. George played no role in Campbell's decision.  Further, Galdamez offered no evidence to rebut Campbell's testimony that, at the time Campbell issued the September 2010 corrective actions, she was unaware of the June 9 letter and the June 16 grievance and the July EEOC charge. We therefore conclude that the district court did not err in granting summary judgment in favor of DHL as to Galdamez's retaliation claims.[15]

## IV.  HOSTILE WORK ENVIRONMENT CLAIM

### A.    St. George's Derogatory Comments and Day-to-Day Treatment of Galdamez

---

[14]To the extent Galdamez claims that Senior Operations Manager Jeffrey Grossman retaliated against her because he was present during the June 10 meeting in St. George's office, her claim fails.  As with St. George, Galdamez has not presented any evidence that Grossman was aware of the June 9 letter at the time of the June 10 meeting and, thus, has failed to show the necessary causal link between those two events.

[15]Galdamez has forfeited her argument that the denial of her light duty work request in November 2010 was retaliation for her preceding protected activities, as she did not identify that denial as retaliatory in her complaint or in her opposition to summary judgment. See Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004) ("[A]n issue not raised in the district court and raised for the first time in an appeal will not be considered by this court." (quotation marks omitted)).

Galdamez claims that, from May 2010 to July 2012, St. George subjected her to a hostile work environment by making two derogatory gender-based comments and by closely supervising her. As to the two comments, Galdamez testified that she heard from another DHL employee that, a "[l]ong time ago," St. George said that "wom[e]n are not capable of working in operations." Also, during a meeting on an unspecified date, St. George stated "these scanners don't work because they were chosen by a woman in Corp[orate]."[16] Galdamez does not claim that St. George made either statement in her presence and does not provide any other information about the circumstances of the two statements.

As to the close supervision, Galdamez testified that, from May 2010 to July 2012, St. George "constantly" monitored her and frequently summoned her into his office to bring some "new issue" related to her performance to her attention.[17] Galdamez testified that St. George did not similarly monitor men. Galdamez gave these examples of St. George monitoring her: (1) her June 10 encounters with St. George, where he criticized her work and asked her where she was going during her 15-minute break; (2) on one day, St. George checked-in on Galdamez 42 times

---

[16]Although in the district court, DHL argued that these statements were inadmissible hearsay evidence, DHL does not make that argument on appeal. Therefore, we consider these statements as evidence in support of Galdamez's hostile work environment claim.

[17]Galdamez also testified that St. George harassed other women by "physically hover[ing] over them when they [were] performing their jobs as if to intimidate [them]." Galdamez did not testify that he physically hovered over her.

17

during that day; and (3) one occasion where St. George blamed Galdamez for another person's mistake, but did not issue any corrective actions for the mistake.[18]

The record contains declarations from three other female DHL employees describing St. George's supervision of them, but these declarations do not support Galdamez's hostile work environment claim. As to Diana Diaz Castellon's declaration, Galdamez did not know about the specific examples of alleged harassment until filing this lawsuit. See Adams v. Austal, U.S.A., L.L.C., No. 12-11507, ___ F.3d ___, 2014 WL 2726171, at *6 (11th Cir. June 17, 2014) (stating that "employees' experiences of which the plaintiff [was] unaware" are not considered in the hostile work environment analysis). Similarly, Galdamez did not show that she was aware of the examples of treatment of women detailed in Yvette Tenord's declaration. And, Jeanette Torres left DHL in 2006, and Galdamez's claim is based on events in 2010 and later.

## B.    Legal Principles

A hostile work environment claim under Title VII is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's

---

[18]In her deposition, Galdamez also testified that St. George mistakenly believed that she had committed an error in 2007 and issued her a corrective action for that purported error. That incident is outside of the scope of her claim for harassment based on events occurring in 2010 and thereafter, and she did not mention this incident in her opposition to DHL's summary judgment motion or in her appellate brief. Thus, we do not consider this incident as part of Galdamez's harassment claim.

employment and create an abusive working environment." Gowski, 682 F.3d at 1311 (quotation marks omitted).

A plaintiff wishing to establish a gender-based hostile work environment claim must show that: (1) she belongs to a protected group; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on her gender; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for such an environment. See Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 808 (11th Cir. 2010) (en banc).

The fourth element of the hostile work environment test—whether the harassment was sufficiently severe or pervasive—contains both a subjective and objective component. Id. at 809. The employee must "subjectively perceive" the harassment as severe or pervasive enough to change the terms or conditions of employment, and this perception must be objectively reasonable. Id.

In evaluating the objective component, we consider the allegedly discriminatory conduct's "frequency; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 808-09 (quotation marks and ellipses omitted). The harassment's objective severity or

pervasiveness "should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Id. at 809 (quotation marks omitted).

## C.    Galdamez's Hostile Work Environment Claim

First, to the extent Galdamez claims that St. George harassed her by his yelling at her and other women, Galdamez has not shown that St. George's conduct was gender-based.[19] See id. at 808. Notably, Galdamez admits that St. George also had conflicts with several male employees and that he always spoke loudly in general. And, in a September 2010 letter, addressed to General Manager Ken Grace and others, Galdamez wrote that: (1) a few days prior to the letter, she had witnessed St. George verbally fight with a male supervisor in front of other DHL employees and (2) St. George had been involved "in at least a dozen of violent problems/arguments with supervisors and agents," both males and females.

Putting aside the non-gender-based conduct, we are left with St. George's two derogatory comments over many years and his "constant monitoring" of Galdamez and other women. As to the two statements, there is no evidence that: (1) Galdamez was present for these statements, (2) St. George repeated these statements, (3) the statements were accompanied with a physical threat, (4) the

---

[19]We recognize that Tenord testified that she had witnessed St. George scream at Galdamez and Galdamez cry over St. George's treatment of her. As discussed above, Galdamez has not shown that St. George's screaming at Galdamez or other women was gender-based. We say this because the record shows that he screamed at men too.

20

statements unreasonably interfered with Galdamez's work performance, or (5) the statements were even made during the May 2010 to July 2012 period relevant to this lawsuit. See Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283 (1998) (providing that "isolated incidents (unless extremely serious)" are insufficient to establish a hostile work environment under Title VII (citation and quotation marks omitted)).

As to the monitoring, we note that "the everyday observation of fellow employees in the workplace is . . . a natural and unavoidable occurrence when people work together in close quarters or when a supervisor keeps an eye on employees." See Mendoza v. Borden, Inc., 195 F.3d 1238, 1248 (11th Cir. 1999) (en banc). During the two-year period from 2010 to 2012, Galdamez only provided details of three of her encounters with St. George—(1) the June 10 encounters; (2) one day when St. George checked-in on her 42 times; and (3) St. George blaming her for another employee's mistake.[20]

The evidence at issue in Galdamez's case falls far short of the evidence that we have determined establishes a hostile work environment. See, e.g., Reeves, 594 F.3d at 811-14.

---

[20]To the extent that Galdamez's description of the June 10 encounters with St. George are sufficiently detailed, the encounters—involving the criticism of her work and asking her where she was going during her 15-minute break—were not severe, physically threatening or humiliating, and did not unreasonably interfere with her work performance.

We conclude that, considering all of the circumstances, a reasonable person would not perceive St. George's conduct vis-à-vis Galdamez as sufficiently severe or pervasive so as to change the terms or conditions of Galdamez's employment. Based on this particular record, we cannot say the district court erred in granting summary judgment in favor of DHL as to the gender-based hostile work environment claim.

## V.  CONCLUSION

For all of the foregoing reasons, we affirm the district court's grant of summary judgment in favor of DHL as to Galdamez's gender-based discrimination and hostile work environment claims and her retaliation claim.

**AFFIRMED.**