[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-14945
Non-Argument Calendar

_____

D.C. Docket No. 2:12-cv-03986-KOB

GUY REDD,

Plaintiff-Appellant,

versus

UNITED PARCEL SERVICE, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(June 26, 2015)

Before HULL, MARCUS and JULIE CARNES, Circuit Judges.

PER CURIAM:

Plaintiff-employee Guy Redd appeals from the district court's grant of

summary judgment in favor of defendant-employer United Parcel Service, Inc.

("UPS"), on his claims of race discrimination and retaliation under Title VII of the

Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a) and 2000e-3 ("Title VII"), and 42 U.S.C. § 1981.  After careful review of the record and briefs, we affirm.

## I.  FACTUAL BACKGROUND

In 1984, defendant UPS hired plaintiff Redd, an African American man.  In 2006, after holding various positions with UPS, Redd became a Business Manager at UPS's Birmingham, Alabama, package center.

Redd's claims of race discrimination and retaliation center on three alleged "adverse employment actions" that occurred during his tenure as a Business Manager at the Birmingham package center—(1) UPS's creation of a retaliatory hostile work environment by employing a "known serial harasser" as Redd's superior, (2) Redd's placement on a management performance improvement plan ("MPIP"), and (3) Redd's subsequent demotion.[1]  We describe the relevant events, viewing the evidence in the light most favorable to Redd.

### A.    October 2008: Redd's Internal Race Discrimination Complaint

Each UPS Business Manager—including Redd—reports directly to a Division Manager who oversees multiple UPS facilities.  Sometime in 2007 or 2008, Dale Mowery, a Caucasian man, became Redd's Division Manager.

On October 23, 2008, Redd submitted an internal complaint to UPS human resources suggesting that Division Manager Mowery and another Caucasian UPS

---

[1]Redd is still working for UPS, and this case is primarily about his demotion.

2

manager had discriminated against him on the basis of race.  Although a human resources manager met with Redd regarding the complaint, there is no evidence that UPS ever followed up on the meeting or investigated Redd's claims.

Subsequently, in the summer of 2009, UPS demoted Division Manager Mowery, transferring him out of Alabama.  For a few months, Redd reported to an interim manager.

## B.    September 2009: Beginning of Alleged Retaliatory Hostile Work Environment

In September 2009, Jaime Diaz, a Hispanic man, who UPS recently had transferred from Kansas to Alabama, became the Division Manager over Redd. During Diaz's time as a manager in Kansas, more than one UPS employee had complained of discrimination, harassment, and retaliation by Diaz.

Redd contends that UPS transferred Diaz, a "known serial harasser," to Alabama in order to create a "hostile work environment" in retaliation for his earlier complaint against Mowery.  Within a few months of Division Manager Diaz's transfer to Alabama, UPS upper management began receiving complaints by multiple employees of discrimination, harassment, and retaliation by Diaz. These complaints included allegations that Diaz discriminated on the basis of race.

## C.    January 2010: the MPIP

At the time that plaintiff Redd began reporting to Division Manager Diaz, Redd was in charge of the Birmingham package center's "preload operation," the

3

process by which packages are unloaded from trailers and loaded onto the brown UPS trucks (called "package cars") for delivery to customers.

Division Manager Diaz believed that Redd was struggling with his responsibilities in the preload operation. For example, Diaz determined that the preload operation supervised by Redd was not meeting the "planned measurement for . . . pieces per hour." As a result, Diaz reassigned Redd to oversee "local sort," the late afternoon operation by which packages dropped off by customers are sorted onto feeder trucks for further processing.

Even after plaintiff Redd's reassignment to local sort, Diaz continued to see deficiencies in Redd's performance. Specifically, Diaz believed that Redd needed to improve his performance in the areas of (1) late and missed service issues; (2) the average time required to complete delivery of packages for Redd's package center; (3) the distribution of package volume among the package cars for Redd's package center; and (4) local sort pieces per hour.

Accordingly, on January 15, 2010, Division Manager Diaz placed Redd on a MPIP. The MPIP outlined areas in which Diaz determined that Redd was deficient, corrective steps, and goals for improvement, with certain processes to be in place by January 22, 2010, with a final review in 90 days. It is undisputed that the MPIP did not change Redd's compensation, benefits, or assigned job duties.

4

In a declaration, plaintiff Redd stated, however, that the MPIP involved additional work and paperwork and "required [him] to work more hours in order to . . . satisfy the MPIP . . . [and] document [his] performance."  And in a deposition, Robert Kibler, a former UPS employee who was never placed on a MPIP, testified that placement on a MPIP is "humiliating" and doubles a manager's workload.

**D.      March 2010-April 2010: Redd's EEOC Charge and Subsequent Meeting with Management**

On March 5, 2010, plaintiff Redd filed an Equal Employment Opportunity Commission ("EEOC") charge, claiming race discrimination and retaliation by Division Manager Diaz based on, in relevant part, Redd's placement on the MPIP.

In April 2010, UPS demoted Division Manager Diaz and transferred him to Tuscaloosa, Alabama.  After Diaz's transfer, Stan Garrett, an African American man, became the Division Manager who oversaw the Birmingham package center and to whom plaintiff Redd reported.

Also in April 2010, Division Manager Garrett and two members of UPS's human resources management met with Redd concerning his March 2010 EEOC charge.  At the meeting, the two human resources managers indicated that "they wanted [Redd] to drop [his] EEOC charge[] because they felt if [he] did, others would drop theirs."

5

**E.      June 2010: Serious Service Failure**

On June 3, 2010, while Division Manager Garrett was away on vacation, a "serious service failure" occurred during the local sort operation under Redd's management. A "serious service failure" involves a failure to make timely delivery of a substantial volume of packages entrusted to UPS.

The service failure began with a mechanical problem that caused the sort to fall behind. When another UPS employee called Redd, who was off premises, and notified him of the problem, Redd returned and took steps to address the issue. Based on information he received from the other UPS employee, Redd called Operations Manager Linda Nelson and reported that 114 packages were affected by the service failure. Nelson asked Redd to advise her of any change to the estimated number of affected packages. After this call, Redd left the building without walking through to confirm the number of affected packages.

The next day, June 4, 2010, at 7:00 a.m., another UPS Business Manager informed Redd that the number of affected packages was actually more than 300. This total included approximately 162 air packages—for which customers paid a premium for next-day delivery—that had not been included in Redd's original 114-package estimate given to Nelson. When he learned this information, Redd, however, did not notify Operations Manager Nelson, did not go to the sorting area

6

to confirm the status of the packages, and did not order scans of the additional packages.

After Nelson learned about the additional affected packages from the other Business Manager, she confronted Redd at 8:45 a.m. that morning. Nelson realized that Redd had known about the additional packages for an hour and forty-five minutes without notifying her, and she accused Redd of hiding the additional packages and requested that an investigation be launched.[2]

### F.    July 2010: Redd's Demotion

When Division Manager Garrett returned from vacation, he received the materials gathered during the investigation of the June 2010 service failure. As part of the investigation, Garrett had Redd prepare his own written report of the service failure. In Garrett's judgment, in the written report, Redd failed to acknowledge Redd's own responsibilities and shortcomings as to the service failure and therefore Garrett instructed Redd to prepare a second report acknowledging and addressing those issues.

Based on all the information Garrett received in connection with the June 2010 service failure, he determined that "Redd's performance was deficient both on the night of June 3, 2010 and the following morning." Redd acted properly in returning to the Birmingham facility when he was notified of the mechanical issue

---

[2]The record does not reveal Nelson's race.

7

that prompted the service failure, but then "he did not manage the situation properly thereafter." In particular, Redd did not determine the correct number of affected packages, gave inaccurate information to Operations Manager Nelson, and did not update Nelson when he learned of additional affected packages. Garrett believed that Redd's mishandling of the service failure and the errors of the employees for whom Redd was responsible "compounded" the original problem.

On July 19, 2010, Garrett demoted Redd from Business Manager to Supervisor. In his deposition, Garrett testified that Redd was demoted generally "because he didn't perform the duties that he needed to perform as a manager" and "he had some service issues that occurred under his management," including the June 2010 service failure and his mishandling of that service failure. Then, in Garrett's declaration, Garrett provided more detail as to Redd's other "service issues" referenced in Garrett's deposition. Garrett explained that Redd was responsible for two other serious service failures—one in January 2010 that affected more than 2,400 packages and one in March 2010. Redd was the only Business Manager under Garrett's supervision that experienced three serious service failures in less than six months. As to the June 2010 service failure in particular, Garrett also considered in his decision to demote Redd the fact that Redd "did not seem to acknowledge that he was accountable" for the service failure.

8

## II.  PROCEDURAL HISTORY

On November 30, 2012, Redd filed the instant suit against UPS, alleging claims of race discrimination and retaliation, in violation of Title VII and § 1981. Specifically, Redd alleged race discrimination based on his placement on the MPIP and his demotion.  He also asserted that UPS retaliated against him for his October 2008 internal complaint of race discrimination by transferring Diaz to be his Division Manager, as Diaz created a hostile work environment.  Finally, he alleged retaliation based on his July 2010 demotion following his March 2010 EEOC charge.

Following discovery, the district court granted UPS's motion for summary judgment and entered final judgment.  This timely appeal follows.

## III.  STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo, viewing all evidence in the light most favorable to the non-moving party.  Owen v. I.C. Sys., Inc., 629 F.3d 1263, 1270 (11th Cir. 2011).  Summary judgment is appropriate when "there is no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

9

## IV.  RACE DISCRIMINATION CLAIMS

On appeal, plaintiff Redd argues that the district court erred in granting summary judgment to UPS on his race discrimination claims based on his placement on the MPIP and his demotion.

Title VII prohibits an employer from discharging, or otherwise discriminating against, an individual with respect to his compensation, terms, conditions, or privileges of employment because of his race.  42 U.S.C. § 2000e-2(a)(1).  The elements of a § 1981 race-discrimination claim are the same as a Title VII disparate-treatment claim and therefore need not be analyzed separately.  See Rice-Lamar v. City of Fort Lauderdale, 232 F.3d 836, 843 n.11 (11th Cir. 2000).

When a plaintiff offers only circumstantial evidence to prove a Title VII claim, as plaintiff Redd does here, we generally use the analytical framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973).  See Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1181 (11th Cir. 2010).

A plaintiff establishes a prima facie case of discrimination through circumstantial evidence by showing that: (1) he belongs to a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class or was treated less

favorably than a similarly situated individual outside his protected class. Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003).

An adverse employment action requires a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir. 2001). To prove the existence of an adverse employment action, an employee must also show a serious and material change in the terms, conditions, or privileges of employment. Id. The employee's subjective view of the significance and adversity of the employer's action is not controlling. Id. Rather, the employment action must be materially adverse as viewed by a reasonable person under the same circumstances. Id.

## A.    Redd's Race Discrimination Claim Based on MPIP

Here, as the district court did, we need discuss only the third element of Redd's prima facie case as to his race discrimination claim based on his MPIP—whether he was subjected to an adverse employment action. See Maynard, 342 F.3d at 1289. We conclude that Redd failed to create a genuine issue of material fact as to whether his placement on the MPIP constituted an adverse employment action. Redd did not present any evidence that the MPIP resulted in a serious and material change in the terms, conditions, or privileges of his employment. See

11

Davis, 245 F.3d at 1239.  Specifically, in his deposition, Redd testified that the corrective steps and goals in the MPIP all involved existing responsibilities of his position as a Business Manager and that the MPIP did not result in any change in pay or benefits.

On appeal, Redd points to his declaration statements that the MPIP involved additional work and paperwork and "required [him] to work more hours in order to . . . satisfy the MPIP . . . [and] document [his] performance," and former UPS employee Robert Kibler's testimony that placement on a MPIP is "humiliating" and doubles a manager's workload.  However, these conclusory and vague references to additional paperwork and unspecified increased work and hours are insufficient to create a genuine issue of material fact as to whether the MPIP resulted in a serious and material change to the terms and conditions of Redd's employment.  And Kibler's subjective view of the humiliation of being placed on a MPIP is not controlling.  See id.  In sum, the district court properly granted summary judgment to UPS on Redd's race discrimination claim based on the MPIP.

## B.    Redd's Race Discrimination Claim Based on Demotion

In this case, the district court found, and neither party disputes, that Redd established a prima facie case of race discrimination based on his demotion.  Under the McDonnell Douglas framework, once a plaintiff-employee establishes a prima

12

facie case of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004).

A defendant's burden of production in articulating a legitimate, nondiscriminatory reason is "exceedingly light." Turnes v. AmSouth Bank, NA, 36 F.3d 1057, 1061 (11th Cir. 1994) (quotations omitted). The employer need not persuade the district court that it was actually motivated by the proffered reason. Wilson, 376 F.3d at 1087. If the employer satisfies its burden, then the burden of production shifts to the plaintiff to offer evidence that the employer's proffered reason is a pretext for illegal discrimination. Id.

The plaintiff can show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" in the proffered reason that a reasonable factfinder could find it unworthy of credence. Springer v. Convergys Customer Mgmt. Grp. Inc., 509 F.3d 1344, 1348 (11th Cir. 2007) (quotation omitted). In attempting to rebut an employer's proffered legitimate, nondiscriminatory reason for an adverse employment action, a plaintiff is not allowed to recast the employer's reason or substitute his business judgment for the employer's judgment. Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). As long as the proffered reason is one that might motivate a reasonable employer, "an employee must meet that reason head on and rebut it,

13

and the employee cannot succeed by simply quarreling with the wisdom of that reason." Id.

Here, the district court determined that (1) UPS articulated a legitimate, nondiscriminatory reason for Redd's demotion, and (2) Redd failed to establish that UPS's reason for demoting him was a pretext for discrimination. We agree.

First, UPS's articulated reason for Redd's demotion—his failure to properly manage the June 3, 2010 serious service failure within the context of concerns generally about his performance—was a legitimate, nondiscriminatory reason that would motivate a reasonable employer to demote Redd. See Wilson, 376 F.3d at 1087; Chapman, 229 F.3d at 1030. To the extent that Redd argues that UPS did not meet its burden because the evidence underlying UPS's reason for demoting him was inconsistent, this argument is relevant instead to pretext and does not show that UPS failed to meet its "exceedingly light" burden to articulate a legitimate, nondiscriminatory reason. See Turnes, 36 F.3d at 1061.

Second, Redd failed to create a genuine issue of material fact as to whether UPS's reason for demoting him was a pretext for discrimination. Redd does not dispute that a serious service failure occurred in the operations for which he was responsible on June 3, 2010, or that he underreported the number of affected packages to management in its aftermath. He instead contends that he took all the

14

necessary steps to address the service failure and that he should not have been held accountable for the failure in the first place.

The relevant inquiry, however, centers on the beliefs of Division Manager Stan Garrett, the decision maker, and whether Garrett was dissatisfied with Redd for the proffered nondiscriminatory reasons, even if mistakenly or unfairly so. See Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010) ("The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head. . . . The question is whether [plaintiff's] employers were dissatisfied with her for these or other non-discriminatory reasons, even if mistakenly or unfairly so, or instead merely used those complaints about [plaintiff] as cover for discriminating against her because of her Cuban origin.").

Moreover, to the extent that Redd argues his actions in addressing the June 2010 service failure were unworthy of demotion, Redd cannot substitute his business judgment for that of Garrett, who testified that Redd's actions as well as his lack of accountability were factors in Garrett's decision to demote him. See Chapman, 229 F.3d at 1030.

Nor has Redd shown that UPS's reasons for demoting him were inconsistent and therefore unworthy of credence. See Springer, 509 F.3d at 1348. Redd argues that Division Manager Garrett's deposition testimony suggested that Redd was

15

demoted solely based on the June 2010 service failure, while Garrett's subsequent declaration stated that Redd's demotion was based on multiple serious service failures over a six-month period. We disagree with Redd's characterization of Garrett's testimony. In his deposition, when Garrett testified about Redd's demotion, he explained generally that Redd "had some service issues that occurred under his management" and discussed specifically the June 2010 service failure. Then, in Garrett's declaration, Garrett provided more detail as to Redd's earlier "service issues" referenced in Garrett's deposition, describing the two other service failures that occurred under Redd's supervision in less than six months.

On appeal, and in the district court, Redd also attempts to show pretext based on a January 2010 "Scorecard," prepared by UPS, that ranks Alabama's package centers for a one-month period. Redd contends that the "Scorecard" shows that he was actually performing well as Business Manager because it ranks the Birmingham package center as ninth out of Alabama's thirty-three package centers. We agree with the district court that the January 2010 "Scorecard" does not create a genuine issue of material fact as to pretext.

For starters, in his deposition, Redd conceded that the "Scorecard" ranked package centers as a whole, not individual managers. In addition, Diaz explained in a declaration that "many of the elements reflected on the scorecard do not correlate to things within an individual manager's control and there are factors that

16

might improve or reduce the ranking of areas of operation listed on the [scorecard] for which a Business Manager has no accountability or right to claim credit."

Finally, Redd attempts to identify other managers who were responsible for multiple service failures but who were not demoted. However, he does not present evidence that another manager under Garrett's supervision was accountable for a serious service failure where that manager made additional mistakes—such as inaccurately reporting the number of affected packages—that compounded the problem. As Garrett explained in his declaration, Redd did not properly manage the June 2010 service failure and, afterward, did not take responsibility for the service failure.

In sum, we cannot say that Redd has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" in UPS's proffered reason for his demotion as to create a genuine dispute about whether it was worthy of credence. See Springer, 509 F.3d at 1348.

## V.  RETALIATION CLAIMS

Title VII prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [thereunder]."  42 U.S.C. § 2000e-3(a).

A plaintiff-employee establishes a prima facie case of retaliation under Title VII by showing that: (1) he engaged in an activity protected under Title VII; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008). "[A] plaintiff making a retaliation claim under § 2000e-3(a) must establish that his . . . protected activity was a but-for cause of the alleged adverse action by the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. ___, ___, 133 S. Ct. 2517, 2534 (2013).

To demonstrate a causal connection, the plaintiff must show that (1) the decision maker knew of his protected activity, and (2) the protected activity and adverse action were not wholly unrelated. Shannon v. BellSouth Telecomms., Inc., 292 F.3d 712, 716 (11th Cir. 2002). The relatedness between the protected activity and adverse action may be demonstrated by a close temporal proximity between them. Id. at 716-17. The temporal proximity must be very close, however, if the plaintiff lacks other evidence of causation. See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007).

"A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough." Id. In contrast, this Court has found that a seven-week gap between a protected activity and an adverse employment action was sufficiently proximate to create a nexus for purposes of

18

establishing a prima facie case of retaliation.  See Farley v. Nationwide Mutual Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999) (concluding that a causal nexus was established based on the supervisors' knowledge of an EEOC charge and the employee's termination seven weeks later).

## A.    Retaliation Claim Based on Demotion

On appeal, plaintiff Redd argues that the district court erred in granting UPS summary judgment on his retaliation claim based on his allegation that he was demoted because of his EEOC charge.

We reject Redd's arguments that the district court erred in finding that he failed to establish a prima facie case of retaliation.  The district court found, and the parties do not dispute, that Redd met the first two elements of his prima facie case by showing that he engaged in statutorily protected activity, filing an EEOC charge, and that he suffered a materially adverse action, a demotion.  As a result, we consider only whether Redd demonstrated a causal connection between the two.  See Crawford, 529 F.3d at 970.

As an initial matter, viewing the evidence in the light most favorable to Redd, Garrett knew about Redd's March 5, 2010 EEOC charge because he was present at the April 2010 meeting during which other management personnel allegedly encouraged Redd to drop the charge.  However, Redd failed to present evidence from which a reasonable jury could find any causal connection between

19

his March 2010 EEOC charge and his demotion four months later in July 2010. See Thomas, 506 F.3d at 1364. This four-month disparity between the protected activity and the adverse employment action falls squarely within the "three to four month" range that this Court has held is insufficient alone to show causation. See id.

On appeal, Redd contends that the relevant date under the temporal proximity analysis is not the date he filed his EEOC charge, but the date of the April 2010 meeting in which Redd was "intimidated and pressured to dismiss his EEOC charge but opposed this action by failing to dismiss his charge." To begin with, Redd mischaracterizes the record evidence of this meeting, as Redd testified in his deposition only that management personnel indicated at the meeting that they wished Redd to drop his EEOC charge.[3] There is no record evidence that Redd was "intimidated and pressured." In any event, even assuming that Redd engaged in protected activity during the meeting under the meaning of § 2000e-3(a), this three-month disparity alone is insufficient to create a causal nexus. See id.

---

[3]In their depositions, the management personnel denied that Redd was in any way encouraged to drop his EEOC charge during the meeting.

Therefore, in the absence of other evidence of causation, Redd failed to demonstrate a causal connection by showing that his protected activity and his demotion were related.  See Shannon, 292 F.3d at 716.[4]

## B.    Retaliatory Hostile Work Environment Claim

Plaintiff Redd's final argument on appeal is that the district court erred in granting UPS summary judgment on his retaliatory hostile working environment claim.  Redd contends that UPS transferred Diaz, "a known serial harasser with pending EEOC charges against him," to Redd's division in order to create a hostile work environment in retaliation for Redd's October 2008 internal complaint against former Division Manager Mowery.[5]

We agree with the district court that UPS was entitled to summary judgment on Redd's retaliatory hostile work environment claim.  Redd again has failed to show a causal connection between his protected activity and the alleged adverse employment action.  To the extent that Redd alleges that Division Manager Diaz's actions while overseeing the Birmingham package center created a hostile work

---

[4]Alternatively, for all the reasons discussed above as to pretext with regard to Redd's race discrimination claim based on his demotion, see discussion supra Part IV.B, we reject Redd's arguments that he showed that UPS's proffered reason for his demotion was a pretext, see Shannon, 292 F.3d at 715 (explaining that once a plaintiff establishes a prima facie case of retaliation and the defendant produces a legitimate reason for the adverse employment action, the plaintiff must show that the reason the defendant gave was pretextual).

[5]This Court recognizes a retaliatory hostile work environment claim.  See Gowski v. Peake, 682 F.3d 1299, 1311-12 (11th Cir. 2012).  The relevant question is whether a reasonable jury could find that the defendant subjected the plaintiff to a hostile work environment in retaliation for protected activity.  See id. at 1312.

environment, there was no evidence that Diaz knew about Redd's protected activity in making the October 2008 internal complaint. See Shannon, 292 F.3d at 716. To the extent that Redd argues that UPS transferred Diaz to his package center to create a hostile work environment in retaliation for Redd's protected activity, Redd has failed to show temporal proximity between the protected activity and the allegedly adverse action. See Thomas, 506 F.3d at 1364. Redd filed his internal complaint in October 2008, almost a year before UPS transferred Diaz to Redd's package center in Fall 2009.

## VI.  CONCLUSION

For the above reasons, we find no reversible error in the district court's grant of summary judgment in favor of UPS. Accordingly, we affirm the judgment.

**AFFIRMED.**