AMY TOTENBERG, UNITED STATES DISTRICT JUDGE
This matter is before the Court on Defendants' Motion for Summary Judgment [doc. 39]. Defendants move for Summary Judgment on Plaintiff's sole claim for retaliation in violation of the Fair Labor Standards Act, 29 U.S.C. 215 (a)(3).
I. Background
The following is a summary of the facts in this case for background purposes. It does not reflect findings of fact by the Court.
*1310 Defendant Furkids is "a 501(c)(3) nonprofit charitable organization, [which] has operated one of the largest cage-free, no-kill cat shelters in the Southeast since 2002." (Def.'s Reply to Pl.'s Resp. to Def.'s Separate St. of Undisputed Material Facts (Def.'s Reply SMF), Doc. 54-1 ¶ 1.) Furkids' shelter "is dedicated to protecting the lives and safety of Atlanta's homeless cats." (Id. ¶ 2.) "Defendant Samantha Shelton is the founder and CEO of Furkids." (Id. ¶ 3.)
Plaintiff, Laura Moakler, loves cats. (Def.'s Reply SMF, Doc. 54-1 ¶ 6.) In June of 2015, this passion led her to a job as a veterinary assistant with Defendant Furkids, Inc. (Id. ¶ 7.) She worked at Furkids until August 1, 2016 when her employment was terminated by Defendants. (Id. ¶¶ 43, 48.) Her termination is the subject of this lawsuit. (Compl.)
As a veterinary assistant, Moakler was required to provide weekly room counts of the cats in Furkids' care, receive intake appointments, carry out and schedule appointments, clean cages, and prepare "med" cards for sick cats. (Furkids Dep., Doc. 40 at 43:2-17.) Both Ms. Moakler and Furkids agree that Ms. Moakler was required to perform room counts weekly. (See id. ; Moakler Dep., Doc. 41 at 8-11.) "Weekly room counts entail counting the cats that are in each room at the cage-free shelter and recording this number on a room count chart that was then given to Furkids' CEO, Shelton." (Def.'s Reply SMF, Doc. 54-1 ¶ 9.) Furkids houses hundreds of cats in 20 largely cage free rooms. (Id. ¶ 9) (The parties dispute whether Furkids houses between 300-350 cats or 400-500 cats.)
Ms. Moakler was an hourly employee with Furkids. (Moakler Dep., Doc. 41 at 10:17-11:19.) Initially, she was paid for thirty hours of work, but at some point, she became a full-time employee and was then paid for forty hours. (Id. ) Ms. Moakler contends that she frequently worked long hours without receiving additional compensation. (Moakler Dep., Doc. 41 at 10:4-9, 11:23-14:5, 19:20-20:1.) These long hours caused stress for Ms. Moakler at home because she was not able to spend time with her family or tend to normal household chores. (Moakler Dep., Doc. 41 at 13:5-14:5, 74:18-21, 118:1-7.) After much discontent, she sought legal advice "to talk about the hours I was working versus the hours I was being paid for." (Moakler Dep., Doc. 41 at 9:10-11.) Her lawyer sent the Defendants a letter on May 25, 2016, which stated that Ms. Moakler retained the firm "to investigate a Fair Labor Standards Act overtime case arising out of her employment with Furkids." (Doc. 50-7 at 1.) The letter does not state any conclusions but merely advises Furkids and Ms. Shelton that Moakler has retained the firm to investigate Ms. Moakler's overtime claim. (Id. )
Ms. Moakler testified that after her lawyer sent the letter, "there was a palpable tension at work and everything changed." (Moakler Dep., Doc. 41 at 43:7-8.) She explained that she experienced this tension with Renee Cardona, the Animal Care Manager, and Terri Brunson, the Shelter Manager. (Id. at 60:24-61:7.) Ms. Moakler testified that "had I worked with Ms. Shelton, there would've been tension, but I didn't work with her." (Id. at 61:8-10.) Defendants provide evidence that neither Brunson nor Cardona knew about the letter from Moakler's attorney at the time Moakler was discharged. (Cardona Decl., Doc. 39-8 ¶ 6; Brunson Decl., Doc. 39-7 ¶ 9). Plaintiff does not dispute this fact in the Parties' Statement of Undisputed Facts. (See Def.'s Reply SMF, Doc. 54-1 ¶ 55.)
Moakler explains that "as soon as the letter was sent, everything changed at work" - Defendants implemented a new *1311 overtime policy, a time card policy, and excluded Plaintiff from staff meetings. (Moakler Dep., Doc. 41 at 43:7-44:5.) The first of these policy changes occurred in early June, when Furkids instituted a policy to stop its employees from working overtime without permission. The parties dispute when this policy was announced to the employees. Defendant Shelton states that it was announced to staff on June 8, 2016, but Ms. Moakler contends that this new policy was announced to staff on June 13, 2016. (See Furkids Dep., Doc. 40 at 56:1-20; Moakler Decl., Doc. 50-3 ¶ 9.) Ms. Shelton testified that on June 8, 2016, "I instructed that no staff was to work beyond their scheduled shift." (Furkids Dep., Doc. 40 at 56:15-20.) Then, Shelton testified that on that same day "Laura Moakler worked beyond her scheduled shift." (Id. ) Moakler disputes this and testified that no one told her to stop working beyond her scheduled shift. (Moakler Dep., Doc. 41 at 55:4-56:21.) Moakler contends that she was notified of the new policy on June 13, 2016. (Moakler Decl., Doc. 50-3 ¶ 9.) On June 12, 2016, a day before Moakler states that she was notified of the new policy, Shelton disciplined Moakler for not following her supervisor's instruction to stop working past 5 p.m. on June 8, 2016. (See Furkids Dep., Doc. 40 at 56:1-20.) Thus, Ms. Moakler claims that she was disciplined for an alleged violation of the new policy before she was advised of the policy change. (Moakler Decl., Doc. 50-3 ¶ 11.)
Second, also on June 12, 2016, Furkids implemented a "Time Card Instructions Policy" and distributed it to all employees, including Moakler. (Furkids Dep., Doc. 40 at 130:16-134:21). Ms. Shelton testified that "[e]very [employee] received a hard copy of the memo and was required to sign it, and then that went into their employee file." (Id. at 134:19-21.) Shelton also testified that Moakler signed the document. (Id. at 135:5-18.) (identifying the memo with Moakler's signature as Exhibit 10). Moakler contends that she was given different instructions than other employees were given regarding working overtime. (Moakler Decl., Doc. 50-3¶ 12.) According to Moakler, other employees were required to obtain permission to work overtime from their direct supervisor, while Moakler was required to obtain prior permission, in writing, from Furkids' CEO. (Moakler Decl., Doc. 50-3 ¶ 12.)
Third, after her attorney sent the letter, Moakler contends she was excluded from staff meetings. According to Defendants, "[m]anagers attend the staff meeting[s]. We had opened it up to vet assistants, but found that the meetings were going quite wrong and it was not as efficient. So we cut back and just said manager level. So we no longer had the vet assistants attending the meeting." (Furkids Dep. at 136:18-23.) Moakler testified that this affected her ability to do her job because "I wasn't privy to the info discussed at the staff meetings.... If there were decisions made, I would not necessarily know these decisions ... that would affect my ability to do my job because I wouldn't know what the priorities were." (Moakler Dep., Doc. 41 at 45:24-46:3.) While Defendants state that this decision meant none of the vet assistants had to attend staff meetings, Moakler notes that she "was the only Vet Assistant scheduled on Mondays when the staff meeting was held." (Moakler Decl., Doc. 50-3 ¶ 18.)
Ultimately, Furkids terminated Ms. Moakler's employment for "failure to follow instructions and complete room counts." (Shelton Decl., Doc. 39-6 ¶¶ 34, 37; see also Shelton Decl., Doc. 39-6 ¶¶ 37-38; Cardona Decl., ¶¶ 4-5; Brunson Decl., ¶ 68). Room counts were supposed to be completed weekly on Mondays. (Moakler Dep., Doc. 41 at 125:20:23, 48:8-11.) Before Ms. Moakler's lawyer sent the letter, Defendants contend that there were three *1312 weeks when Ms. Moakler did not provide room counts and Ms. Shelton emailed her to request that she send the counts. (Def.'s Reply SMF, Doc. 54-1 ¶¶ 20-24; Moakler Dep., Doc. 41 at 125:24-126:23) (describing Shelton's emails to Moakler regarding missed room counts on February 2, 2016, April 27, 2016, May 12, 2016.) After the first missed room count on February 2, 2016, Shelton emailed Moakler about the missed count and she complied by providing the count. (Moakler Dep., Doc. 41 at 125:24-126:3.) Then, on April 27, 2016, Shelton again had to email Moakler to provide the room count. (Id. at 126:4-9.) This time, Moakler did not comply, and Shelton sent Moakler another email on May 4, 2016, stating "it's been a week and I do not have the room counts." (Id. at 126:10-19). Then, just a few days later on May 12, 2016, Shelton emailed Moakler to ask her to provide the room count. (Id. at 126:2-23.)
After Ms. Moakler's lawyer sent the letter, Furkids contends and Moakler agrees that she failed to provide seven weeks of room counts. (Moakler Dep., Doc. 41 at 128:11-131:17) (June 6, 2016, June 13, 2016, June 20, 2016, July 4, 2016, July 11, 2016, July 25, 2016, and August 1, 2016). After the second missed room count on June 13, 2016 Shelton gave Moakler a written warning. Moakler testified that the June 17, 2016 warning stated "[a]s you are aware, you're expected to provide me with a weekly inventory of the cat rooms at the cat shelter. You have not fulfilled this responsibility after repeated requests. If you fail to provide this information weekly, your employment will be terminated." (Moakler Dep., Doc. 41 at 57:22-58:15.)
According to Ms. Shelton, "[d]oing room counts was an important part of Moakler's job. Timely and accurate room counts allow Furkids to make decisions on intakes. Not having timely and accurate room counts can lead to negative outcomes for Furkids and its feline wards." (Shelton Decl., Doc. 39-6, ¶ 10.) Additionally, "[h]aving too many cats at the shelter could create safety or health issues for the cats and/or employees. As a result, Furkids tries to avoid rescuing more cats than it can safely and responsibly care for. On the other hand, having unused capacity at Furkids is contrary to Furkids' charitable mission of rescuing as many homeless cats as possible." (Id. ¶ 11.) Thus, she states that she "needed the room counts by Monday of each week so that [she and Furkids] knew the turnover in cats that occurred the previous weekend, could prepare for the week, and knew how much space [they] had to rescue more cats." (Id. ¶ 14.) However, Moakler states that "[r]oom counts were not an important part of [her] duties." (Moakler Decl., Doc. 50-3 ¶ 5.) According to Moakler, "[d]ecisions were not based on room counts. Furkids would provide shelter for cats irrespective of the room counts." (Id. ¶ 6.) Thus, Moakler contends that "[r]oom counts were not used to allocate Furkids' resources." (Id. ¶ 8.) The parties also dispute whether performing room counts was solely Moakler's responsibility. (Compare Moakler Decl., Doc. 50-3 ¶ 7 ("Other Furkids' employees besides myself performed room counts.") with Furkids Dep., Doc. 40 at 102:18-24 (stating that no one else did room counts).)
On August 1, 2016, Ms. Shelton decided to terminate Ms. Moakler's employment "for failing to follow instructions regarding completing room counts." (Shelton Decl., Doc. 39-6 ¶ 34.) Ms. Shelton told Cardona and Brunson about her decision, and then she witnessed Cardona tell Ms. Moakler. (Id. ¶¶ 37-38.) Moakler was provided with a Separation Notice, which stated "employee was discharged for repeatedly failing to follow her supervisor's instructions. She was previously disciplined for failing to complete her weekly inventory and told that further instances would result in termination *1313 of employment." (Moakler Dep., Doc. 41 132:21-25.)
II. Legal Standard for Summary Judgment
Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. The substantive law applicable to the case determines which facts are material. Anderson v. Liberty Lobby Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his favor." United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Counties in State of Ala. , 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (citations and punctuation omitted). The Court may not weigh conflicting evidence or make credibility determinations. Hairston v. Gainesville Sun Publ'g Co. , 9 F.3d 913, 919 (11th Cir. 1993), reh'g denied , 16 F.3d 1233 (11th Cir. 1994) (en banc).
For issues upon which the moving party bears the burden of proof at trial, the moving party must affirmatively demonstrate the absence of a genuine issue of material fact as to each element of its claim on that legal issue. Fitzpatrick v. City of Atlanta , 2 F.3d 1112, 1115 (11th Cir. 1993). It must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. Id. If the moving party makes such a showing, it is entitled to summary judgment unless the non-moving party comes forward with significant, probative evidence demonstrating the existence of an issue of fact. Id.
When the non-moving party bears the burden of proof at trial, however, the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim. Id. Instead, the moving party may point out to the district court that there is an absence of evidence to support an element of the non-moving party's case. Id. The non-moving party must then respond with sufficient evidence to withstand a directed verdict motion at trial. FED. R. CIV. P. 56(e) ; Hammer v. Slater , 20 F.3d 1137, 1141 (11th Cir. 1994).
III. Analysis
Defendants argue that Ms. Moakler failed to allege a prima facie case of retaliation because she did not engage in activity protected under the FLSA and there is no causal connection between her termination and her alleged protected activity. Further, they contend that even if Moakler were able to allege a prima facie case, she failed to show pretext for discrimination that rebuts the Defendants' legitimate non-retaliatory reason for terminating her employment.
Ms. Moakler argues that she has successfully alleged a prima facie case, because the letter from her attorney is protected activity and there is a causal connection between her protected activity and her termination. She further contends Defendant's proffered legitimate non-retaliatory reason is "not worthy of credence" because it was only after Ms. Moakler's protected activity that Defendants made "Ms. Moakler's failure to conduct weekly room counts a terminable offense." (Doc. 50 at 17.)
The FLSA protects persons against retaliation for asserting their rights under the statute. 29 U.S.C. 215 (a)(3) ("it shall be unlawful for any person ... to discharge or in any other manner discriminate against any employee because such employee has filed any complaint."). "The anti-retaliation provision of the FLSA was designed to prevent fear of economic retaliation by an employer *1314 against an employee who chose to voice such a grievance." E.E.O.C. v. White & Son Enterprises , 881 F.2d 1006, 1011-12 (11th Cir. 1989). Importantly, "[t]he FLSA's prohibition on retaliation is broader than its coverage of minimum wage or overtime wage violations, and applies even if the employee cannot show 'individual coverage' or 'enterprise coverage.' " Obregon v. Jep Family Enterprises, Inc. , 710 F.Supp.2d 1311, 1314 (S.D. Fla. 2010), vacated , No. 09-21753-CIV, 2011 WL 13173600 (S.D. Fla. Aug. 25, 2011) (citing Wirtz v. Ross Packaging Co. , 367 F.2d 549, 550-51 (5th Cir. 1966) ).
"A prima facie case of FLSA retaliation requires a demonstration by the plaintiff of the following: (1) she engaged in activity protected under the act; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action." Wolf v. Coca-Cola Co. , 200 F.3d 1337, 1342-43 (11th Cir. 2000) (internal citations and quotations omitted); Miller v. Roche Sur. & Cas. Co. , 502 F. App'x 891, 893-94 (11th Cir. 2012). Once the plaintiff establishes a prima facie case, "the employer has the burden to produce a lawful basis for the employment action. The plaintiff must then produce evidence to show that the employer's proffered basis is pretextual. If the plaintiff cannot, the defendant is entitled to summary judgment." Wigfall v. St. Leo Univ., Inc. , 517 F. App'x 910, 912 (11th Cir. 2013) ; Wolf. , 200 F.3d at 1342-43 (applying the burden-shifting framework to a retaliation claim under the Fair Labor Standards Act) ("If the employer asserts a legitimate reason for the adverse action, the plaintiff may attempt to show pretext. In demonstrating causation, the plaintiff must prove that the adverse action would not have been taken "but for" the assertion of FLSA rights.".) To demonstrate pretext, Plaintiff must do more than simply question the Defendants' business decisions, as "[a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer." Chapman v. AI Transport , 229 F.3d 1012, 1030 (11th Cir. 2000). Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Id.
a. Prima Facie Case
Moakler carries the burden of establishing a prima facie case by showing that (1) she engaged in activity protected by the FLSA, (2) she subsequently suffered adverse action by the employer, and (3) a causal connection existed between the employee's activity and the adverse action. Wolf v. Coca-Cola Co. , 200 F.3d 1337, 1342-43 (11th Cir. 2000).
The FLSA protects employees who have filed "any complaint." 29 U.S.C. § 215(a)(3). "[T]he phrase 'filed any complaint' contemplates some degree of formality, certainly to the point where the recipient has been given fair notice that a grievance has been lodged and does, or should, reasonably understand the matter as part of its business concerns." Kasten v. Saint-Gobain Performance Plastics Corp. , 563 U.S. 1, 13, 131 S.Ct. 1325, 179 L.Ed.2d 379 (2011). Thus, "the complaint must be sufficiently clear and detailed so that a reasonable employer, considering the context and content, can understand that an employee is asserting rights provided by the FLSA and calling for the protection of those rights." Miller v. Roche Sur. & Cas. Co. , 502 F. App'x 891, 894 (11th Cir. 2012) (citing Kasten , 563 U.S. at 6-7, 131 S.Ct. 1325 )
Plaintiff asserts that the letter from her attorney to her employer constituted a complaint that provided sufficiently clear and detailed notice so that Defendants understood *1315 that she was asserting her rights under the FLSA. Indeed, her attorney explicitly said as much in the letter. (See Letter, Doc. 50-7.)
Defendants maintain that Plaintiff has failed to engage in protected activity because she lacked an objectively good faith reasonable belief that her employer's conduct was unlawful. According to Defendants, the good faith reasonable belief has an objective and subjective component. Defendants argue that Ms. Moakler could not have an objectively good faith reasonable belief that her employer's conduct was unlawful because she was not covered by the FLSA under either an enterprise or individual basis.
While Defendants maintain that this is a requirement, they fail to cite Eleventh Circuit precedent that applies this requirement in the FLSA-retaliation context. The Eleventh Circuit has not addressed whether a Plaintiff alleging retaliation in violation of the FLSA must demonstrate a good faith reasonable belief. However, a few district courts in this circuit have held that a Plaintiff alleging retaliation in violation of the FLSA must have a good faith reasonable belief that her employer's conduct is unlawful. See Baker v. Supreme Beverage Co. , No. 2:13-CV-00222-AKK, 2014 WL 7146790, at *7 (N.D. Ala. Dec. 15, 2014) ; Langston v. Lookout Mountain Cmty. Servs. , No. 4:16-CV-00239-HLM-WEJ, 2017 WL 6612866, at *14 (N.D. Ga. Oct. 11, 2017), report and recommendation adopted , No. 4:16-CV-0239-HLM-WEJ, 2017 WL 6619236 (N.D. Ga. Nov. 13, 2017).
In the Title VII context, the Eleventh Circuit has held that the " 'reasonable belief' element has an objective and a subjective component." Little v. United Technologies, Carrier Transicold Div. , 103 F.3d 956, 960 (11th Cir. 1997) (Tit. VII). "[T]he plaintiff must not only show that she subjectively (i.e., in good faith) believed the defendant was engaged in unlawful employment practices, but also that her "belief was objectively reasonable in light of the facts and record present." Furcron v. Mail Centers Plus, LLC , 843 F.3d 1295, 1311 (11th Cir. 2016) (Tit. VII) (emphasis in original). The objective reasonableness of her belief is measured by reference to controlling substantive law. Id. (citing Butler v. Ala. Dep't of Transp. , 536 F.3d 1209, 1214 (11th Cir. 2008) (Tit. VII) ). Even so, the plaintiff is not required to prove that the discriminatory conduct complained of was actually unlawful. Little , 103 F.3d at 960. The conduct opposed need only "be close enough to support an objectively reasonable belief that it is." Clover v. Total Sys. Servs., Inc. , 176 F.3d 1346, 1351 (11th Cir. 1999) (Tit. VII). Moreover, the FLSA's anti-retaliation provision is meant to cover employees who are not covered by the FLSA's wage and hour provisions, but who have engaged in protected activity under the Act.[1] See *1316 Wirtz v. Ross Packaging , 367 F.2d 549 (5th Circ. 1966).[2] In Wirtz , the Defendant business terminated an employee after he participated in a wage and hour investigation. Id. at 550. The District Court "refused to award relief [to one employee], concluding that his discharge was not in violation of the Act, since 'the evidence was insufficient to establish that any employees of [Defendant business] were engaged in commerce or in the production of goods for commerce.' " Id. The Fifth Circuit overturned the District court, reasoning that "the protections of Section 15(a)(3) apply, without qualification, to 'any employee.' " Id. Accordingly, "the clear and unambiguous language of the statute refutes the district court's view that either the employee or his employer must be engaged in activities covered by the Act's wage and hour provisions in order for the strictures against discriminatory discharge to be invoked." Id. at 550-551.
Even if this requirement applies to FLSA-retaliation cases, this Court is inclined to find that Plaintiff had an objectively good faith reasonable belief that her employer's conduct was illegal. Ms. Moakler worked as an hourly employee and therefore viewed herself as likely entitled to the overtime compensation protections provided under federal law when she worked overtime hours. (Moakler Dep., Doc. 41 at 10:17-23) (Furkids Dep., Doc. 40 at 44:3-5.) This was an objectively reasonable belief because it is true in connection with the vast majority of hourly wage employees working for employers the size of Furkids. She also consulted an attorney with a specialty in employment law who in turn contacted Furkids in an effort to investigate her claim. Moakler's course of action reflects a diligent effort to obtain information concerning her status and the legality of defendants' pay practices and properly would authorize the Court to find that she engaged in protected activity under the FLSA. However, the Court need not reach a definitive finding in this regard because, as discussed later, Plaintiff's claim ultimately flounders on another ground: Moakler's failure to show that Defendant's legitimate non-retaliatory reason for her termination was a pretext for retaliation. For purposes of the Court's analysis here though, the Court treats Plaintiff's evidence as satisfying the requirement that she engaged in activity protected by the FLSA based on the evidence submitted.[3]
As to the other elements of Plaintiff's prima facie case, the parties do not dispute that Plaintiff's termination by Furkids constitutes an adverse action. The parties do dispute, though, whether Plaintiff has shown, as required, "that the protected activity and the adverse action were not wholly unrelated."
*1317 Clover v. Total Sys. Servs., Inc. , 176 F.3d 1346, 1354 (11th Cir. 1999) (internal citations and quotations omitted). "A plaintiff can satisfy this burden if she can prove a 'close temporal proximity' between the time her employer learned about her protected activity and her discharge. Raspanti v. Four Amigos Travel, Inc. , 266 F. App'x 820, 823 (11th Cir. 2008). However, "[t]his standard requires that the actions be 'very close.' " Id. While "[a] three to four month disparity between the statutorily protected expression and the adverse employment action is not enough," Thomas v. Cooper Lighting, Inc. , 506 F.3d 1361, 1364 (11th Cir. 2007), the Eleventh Circuit has held two months is close enough. See e.g., Robinson v. LaFarge N. Am., Inc. , 240 F. App'x 824, 829 (11th Cir. 2007) ("[plaintiff] established a prima facie case, as the demotion occurred only about two months after he filed a grievance.").
Defendants argue Moakler has failed to establish a causal connection because her allegations do not suggest a causal connection and the temporal proximity here is not close enough. Specifically, Defendants argue that Moakler's attendance at staff meetings was entirely unrelated to both her attorney's letter and her discharge. Further, they argue there is no evidence that Moakler's write-up for working late is connected to her discharge. Third, they contend the tension Ms. Moakler says she felt cannot be related to the letter, because Moakler claimed she experienced this tension between herself and Brunson and Cardona and there is undisputed evidence that neither Brunson nor Cardona knew about the letter. (Doc. 39-1 at 17) (citing Moakler Dep., Doc. 41 at 60:24-61:12; Cardona Decl., ¶ 6; Brunson Decl. ¶ 9).
Moakler contends that the time that elapsed between her letter and her discharge - just over two months - is close enough to support that the two events were connected. She then argues that if the Court rejects the temporal proximity as insufficiently close, the evidence shows a pattern of treating Moakler disfavorably after her protected activity. This pattern includes the significant rise in workplace tension Moakler experienced after Furkids's CEO received her counsel's letter. Indicia of this include Defendants' exclusion of Moakler from staff meetings, Defendant's threats to terminate her for working late, and threats to fire her for not completing room counts.
Here, there were sixty-eight days, just over two months, between Ms. Moakler's protected activity and her termination. The Court finds this is sufficient to establish temporal proximity. See Redd v. United Parcel Serv., Inc. , 615 F. App'x 598, 606 (11th Cir. 2015) (acknowledging that the Eleventh Circuit "found that a seven-week gap between a protected activity and an adverse employment action was sufficiently proximate to create a nexus for purposes of establishing a prima facie case of retaliation.) (citing Farley v. Nationwide Mut. Ins. Co. , 197 F.3d 1322, 1337 (11th Cir. 1999) ); compare Henderson v. FedEx Express , 442 F. App'x 502, 506 (11th Cir. 2011) (per curium) (explaining that "[i]f there is a delay of more than three months between the two events, then the temporal proximity is not close enough, and the plaintiff must offer some other evidence tending to show causation.").
The temporal proximity evidence in connection with evidence of rising workplace tension and threats of adverse action are sufficient to establish a prima facie case.
b. Defendants' Legitimate, Non-retaliatory Reason for Termination
Once a plaintiff has established a prima facie case of retaliation, "[t]he employer then must articulate a legitimate nonretaliatory reason for the adverse employment *1318 action." Raspanti v. Four Amigos Travel, Inc. , 266 F. App'x 820, 822 (11th Cir. 2008). It is undisputed that Defendants have done so by stating that Moakler was terminated for repeatedly failing to conduct room counts. Specifically, Moakler's Separation Notice stated "employee was discharged for repeatedly failing to follow her supervisor's instructions. She was previously disciplined for failing to complete her weekly inventory and told that further instances would result in termination of employment." (Moakler Dep., Doc. 41 132:21-25.) As Defendants have produced legitimate, non-retaliatory reasons for Moakler's termination, the Court must consider whether Moakler has demonstrated that these reasons are instead a pretext for retaliation. Wolf , 200 F.3d at 1343.
c. Pretext
In order to successfully rebut an employer's nondiscriminatory rationale for its employment decision, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherence, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could find them unworthy of credence." Combs v. Plantation Patterns , 106 F.3d 1519, 1538 (11th Cir. 1997). The Plaintiff is required to prove "that the desire to retaliate was the but-for cause of the challenged employment action." Univ. of Texas Sw. Med. Ctr. v. Nassar , 570 U.S. 338, 339, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013).[4]
"A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute h[er] business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Chapman v. AI Transport , 229 F.3d 1012, 1030 (11th Cir. 2000) ; see also Wigfall v. St. Leo Uni. , 517 Fed. App'x 910 (11th Cir. 2013) (applying Chapman in the FLSA context). Likewise, "federal courts do not sit as a super-personnel department that reexamines an entity's business decisions.... Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior." Elrod v. Sears, Roebuck & Co. , 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting Mechnig v. Sears, Roebuck & Co. , 864 F.2d 1359, 1365 (7th Cir. 1988) ); Moore v. Sears, Roebuck & Co. , 683 F.2d 1321, 1323 n.4 (11th Cir. 1982) ("[F]or an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith believed plaintiff's performance to be unsatisfactory.")
Plaintiff Moakler argues that Defendants proffered reason for terminating her for not performing room counts is a mere pretext to disguise retaliation. She urges this Court that the changes that took place after her protected activity - making failure to conduct room counts and staying after hours terminable offenses, subjecting her to increased scrutiny, formal write-ups, *1319 and not allowing her to attend staff meetings - "cast[ ] ample doubt on the defendant's proffered nondiscriminatory reason for terminating her employment." (Doc. 50 at 17.)
Defendants argue that Moakler has failed to show pretext because she admitted that her termination was for failing to follow instructions regarding room counts. (Doc. 54 at 9.) Moreover, they contend that her examples about the changes that took place after her protected activity are not logically connected to her termination. (Doc. 54 at 9.)
Here, Plaintiff has failed to carry her burden to show pretext as she has failed to rebut Defendant's core legitimate non-retaliatory reason for its termination action. Defendants maintain that Moakler was fired for repeatedly failing to provide room counts, a requirement of her job. Plaintiff admits that she repeatedly failed to provide room counts. (Moakler Dep., Doc. 41 at 128:11-131:17.) While Plaintiff argues that it was only after her protected activity that failing to provide room counts became a terminable offense, she has not shown that Defendants instituted a new policy regarding room counts to retaliate against her.
Defendants have shown that Moakler failed to provide room counts before and after her protected activity. Before Ms. Moakler's lawyer sent the letter, Defendant contends that there were three weeks when Ms. Moakler did not provide room counts. (See Def.'s Reply SMF, Doc. 54-1 ¶¶ 20-24; Moakler Dep., Doc. 41 at 125:24-126:23) (describing Shelton's emails to Moakler regarding missed room counts on February 2, 2016, April 27, 2016, May 12, 2016.) Ms. Moakler's lawyer sent the letter on May 25, 2016. (See Doc. 5-7.) Ms. Moakler then missed room counts on June 6, 2016 and June 13, 2016. (Moakler Dep., Doc. 41 at 129:3-8) (confirming that Moakler did not do any room counts between May 30th and June 23rd.) Confronted with an employee who repeatedly failed to do a core aspect of her job, Defendants gave her a written warning on June 17, 2016 that a continued failure would lead to her termination. (Moakler Dep., Doc. 41 at 57:22-58:15.) After the warning she continued to fail to provide timely room counts. (See Moakler Dep., Doc. 41 at 129:12- (acknowledging that Moakler provided late room counts the weeks of July 4, 2016, July 11, 2016, July 25, 2016, and August 1, 2016); (see also Def.'s Reply SMF, Doc 54-1 ¶¶ 38, 39, 41, 42) (Plaintiff does not dispute that she did not provide room counts on July 4, 2016, July 11, 2016, and July 25, 2016, but disputes that Moakler did not provide a room count on August 1, 2016 as this was the day Moakler was discharged). Thus, Ms. Moakler failed to timely provide the counts, and her rate of failure actually increased after her protected activity.
While Moakler disputes the importance of room counts, this contention is immaterial to the Court's analysis as "the employee cannot succeed by simply quarreling with the wisdom of [the employer's] reason." Chapman v. AI Transport , 229 F.3d 1012, 1030 (11th Cir. 2000).
Moakler also argues that her job was changed by Furkids excluding her from staff meetings but fails to state how this change affected her ability to actually do her job. (Moakler Dep., Doc. 41 at 45:17-48:7.) She further maintains that she was subjected to increased scrutiny and a write-up for working overtime without being advised of the overtime policy change. While this may be true, taking the evidence in the light most favorable to Plaintiff, Plaintiff was not fired for working overtime; she was fired for failing to follow instructions regarding providing room counts that the employer - correctly or not - viewed as essential to its operations. (See Shelton Decl., Doc. 39-6, ¶¶ 10, 11, 14.)
*1320 Based on the summary judgment record and applicable legal standards for demonstration that Defendant's reasons were a pretextual cloak for retaliation, the Court finds that Plaintiff has not shown sufficient evidence upon which a jury could reasonably find that her termination was a pretext for unlawful retaliation. Accordingly, Plaintiff's FLSA retaliation claim fails as a matter of law.
IV. Conclusion
Defendants' Motion for Summary Judgment [Doc. 39] is GRANTED . The Clerk is DIRECTED to close this case.
IT IS SO ORDERED this 12th day of February, 2019.

While there is no Eleventh Circuit authority since Wirtz on this issue, the District Court in Joseph recognized that "the lack of individual or enterprise coverage for an overtime claim does not defeat a retaliatory discharge claim under 29 U.S.C. 215(a)(3)" Joseph v. Nichell's Caribbean Cuisine , 862 F.Supp.2d 1309, 1314 (S.D. Florida 2012). Moreover, courts have held that "determining whether there is an actual violation [of the FLSA] can mislead even an experienced district court." Sapperstein v. Hager , 188 F.3d 852, 857 (7th Cir. 1999) ; see also Mitchell v. Robert DeMario Jewelry, Inc. , 361 U.S. 288, 292, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960). Congress intended "to encourage reporting of suspected violations by extending protection to employees who filed complaints, instituted proceedings, or indeed, testified in such proceedings, as long as these concerned the minimum wage or maximum hour laws. To enjoy those protections the conduct at issue must be 'under' or 'related to' those laws. There is no requirement that those laws must actually be violated. It is sufficient that the plaintiff had a good-faith belief that they might be violated. No further requirements are implied by the law." Id. ; see also Cedano v. Alexim Trading Corp. , 2011 WL 5239592 (S.D. Florida 2011) ("[t]his Court finds that the retaliatory firing provision of the FLSA applies to Plaintiffs even if they are exempted from the wage and hour provisions of the same Act, and that questions of material fact exist regarding whether the firings were retaliatory."); Elbaz v. Congregation Beth Judea, Inc. , 812 F.Supp. 802 (ND. Ill. 1992) ("employees making allegations of retaliatory conduct need not prove that an employment practice actually violated the FLSA").

In Bonner v. City of Prichard , 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

Defendant's contention that Plaintiff should have been aware of a single Labor Department bulletin would effectively impose a requirement that every employee become her own pro se legal advocate and specialist. Plaintiff properly contacted a labor lawyer who in turn exercised appropriate professional judgment in contacting Furkids to investigate the merits of Plaintiff's concerns.

While Nassar addressed the standard applicable in a Title VII case, "[t]here is no meaningful basis on which to distinguish the language in Title VII's anti-retaliation provision and the language in the FLSA's provision." Kubiak v. S.W. Cowboy, Inc. , 164 F.Supp.3d 1344, 1365, n. 30 (M.D. Fla. 2016) (describing why Nassar is applicable to the FLSA's anti-retaliation provision and how some courts have applied Nassar to FLSA-retaliation claims). Plaintiff referred the Court to Reich v. Davis , 50 F.3d 962, 965 (11th Cir. 1995) as stating the appropriate standard of proof, acknowledging that Reich used the "motivating factor" test, which has been ruled equivalent to a 'but for' standard. See Pl.'s Resp. in Opp., Doc. 50 at 17.